[Civ. No. 41800. Second Dist., Div. Two. Jan. 14, 1974.]

Estate of JUAN ABLE VARGAS, JR., Deceased.
MILDRED VARGAS, Petitioner and Appellant, v.
JOSEPHINE VARGAS, Claimant and Respondent.

**COUNSEL**

Ronald L. Katsky, Peter H. Kruse and Lawrence Earl Logue for Petitioner and Appellant.

Ervin M. Roeder, N. E. Youngblood and Barry T. Harlan for Claimant and Respondent.

**OPINION**

**FLEMING, J.**—For 24 years Juan Vargas lived a double life as husband and father to two separate families, neither of which knew of the other's existence. This terrestial paradise came to an end in 1969 when Juan died intestate in an automobile accident. In subsequent heirship proceedings the probate court divided his estate equally between the two wives. Juan's first wife Mildred appeals, contending that the evidence did not establish Juan's second wife Josephine as a putative spouse, and that even if Josephine were considered a putative spouse an equal division of the estate was erroneous.[1]

Mildred presented evidence that she and Juan married in 1929, raised three children, and lived together continuously in Los Angeles until Juan's death in 1969. From 1945 until his death Juan never spent more than a week or 10 days away from home. They acquired no substantial assets until after 1945.

Josephine countered with evidence that she met Juan in 1942 while employed in his exporting business. They married in Las Vegas in February 1945 and went through a second marriage ceremony in Santa Ana in May 1945. Josephine knew Juan had been previously married, but Juan assured her he had acquired a divorce. In July 1945 they moved into a home in West Los Angeles and there raised a family of four children. After 1949 Juan no longer spent his nights at home, explaining to Josephine that he spent the nights in Long Beach in order to be close to his business,

---

[1] For an earlier appeal concerning appointment of an administrator for Juan's estate, see *Vargas* v. *Superior Court,* 9 Cal.App.3d 470 [88 Cal.Rptr. 281].

but he and Josephine continued to engage in sexual relations until his death in 1969. He visited Josephine and their children every weekday for dinner, spent time with them weekends, supported the family, and exercised control over its affairs as husband and father. Throughout the years Josephine continued to perform secretarial work for Juan's business at home without pay.

The foregoing evidence amply supports the court's finding that Josephine was a putative spouse. ■ An innocent participant who has duly solemnized a matrimonial union which is void because of some legal infirmity acquires the status of putative spouse. (*Estate of Foy*, 109 Cal. App.2d 329, 331 [240 P.2d 685].) ■ Although Josephine's marriage was void because Juan was still married to Mildred, Josephine, according to her testimony, married Juan in the good-faith belief he was divorced from his first wife. Her testimony was not inherently improbable; her credibility was a question for determination by the trial court (*Estate of Goldberg*, 203 Cal.App.2d 402, 412 [21 Cal.Rptr. 626]; *Estate of Long*, 198 Cal.App.2d 732, 737-738 [18 Cal.Rptr. 105]); and court acceptance of her testimony established her status as a putative spouse.

■ The more difficult question involves the equal division of Juan's estate between Mildred and Josephine.

California courts have relied on at least two legal theories to justify the award of an interest in a decedent's estate to a putative spouse. (Luther & Luther, *Support and Property Rights of the Putative Spouse*, 24 Hastings L.J. 311, 313-317; see also Annot., 31 A.L.R.2d 1255, 1271-1277.) The theory of "quasi-marital property" equates property rights acquired during a putative marriage with community property rights acquired during a legal marriage. (*Blache* v. *Blache*, 69 Cal.App.2d 616, 624 [160 P.2d 136].) Subsequent to the time of Juan's death this theory was codified in Civil Code section 4452: "Whenever a determination is made that a marriage is void or voidable and the court finds that either party or both parties believed in good faith that the marriage was valid, the court shall declare such party or parties to have the status of a putative spouse, and, if the division of property is in issue, shall divide, in accordance with Section 4800, that property acquired during the union which would have been community property or quasi-community property if the union had not been void or voidable. Such property shall be termed 'quasi-marital property.' "

A second legal theory treats the putative marriage as a partnership: "In effect, the innocent putative spouse was in partnership or a joint

enterprise with her spouse, contributing her services—and in this case, her earnings—to the common enterprise. Thus, their accumulated property was held in effect in tenancy-in-common in equal shares. Upon death of the husband, only his half interest is considered as community property, to which the rights of the lawful spouse attach." (*Sousa* v. *Freitas*, 10 Cal. App.3d 660, 666 [89 Cal.Rptr. 485].)

In practice, these sometimes-conflicting theories have proved no more than convenient explanations to justify reasonable results, for when the theories do not fit the facts, courts have customarily resorted to general principles of equity to effect a just disposition of property rights. (*Coats* v. *Coats,* 160 Cal. 671, 678 [118 P. 441].) For example, in *Brown* v. *Brown*, 274 Cal.App.2d 178 [79 Cal.Rptr. 257], the court found that a legal wife's acquiescence in a putative wife's 28-year marriage equitably estopped the legal wife from claiming any interest in the community property.

The present case is complicated by the fact that the laws regulating succession (Prob. Code, § 220 ff.) and the disposition of marital property (Civ. Code, § 4800 ff.) are not designed to cope with the extraordinary circumstance of purposeful bigamy at the expense of two innocent parties.[2] The laws of marital succession assume compliance with basic law (Civ. Code, § 3548) and do not provide for contingencies arising during the course of felonious activity. For this reason resort to equitable principles becomes particularly appropriate here. ■ "Equity or chancery law has its origin in the necessity for exceptions to the application of rules of law in those cases where the law, by reason of its universality, would create injustice in the affairs of men." (*Estate of Lankershim,* 6 Cal.2d 568, 572-573 [58 Cal.Rptr. 1282]; see also, *Holy Trinity Church* v. *United States*, 143 U.S. 457, 472 [36 L.Ed. 226, 232, 12 S.Ct. 511]; *Lynch* v. *Overholser*, 369 U.S. 705, 710 [8 L.Ed.2d 211, 215, 82 S.Ct. 1063].) ■ Equity acts "in order to meet the requirements of every case, and to satisfy the needs of progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed." (*Wuest* v. *Wuest*, 53 Cal.App.2d 339, 346 [127 P.2d 934].) ■ Equity need not wait upon precedent "but will assert itself in those situations where right and justice would be defeated but for its intervention." (*Satterfield* v. *Garmire*, 65 Cal.2d 638, 645 [56 Cal. Rptr. 102, 422 P.2d 990].) For example, in *Estate of Krone*, 83 Cal.App.

---

[2]"[I]n most, if not all, of the reported decisions involving a putative spouse, the supposed husband did in fact separate from his lawful wife." (Luther & Luther, *supra,* at p. 318.)

2d 766, 769-770 [189 P.2d 741], where the putative husband died intestate and there was no legal wife, the court awarded the entire quasi-marital estate to the putative wife, even though the putative wife had no legal claim to the husband's share of the quasi-marital estate.

In the present case, depending on which statute or legal theory is applied, both Mildred, as legal spouse, and Josephine, as putative spouse, have valid or plausible claims to at least half, perhaps three-quarters, possibly all, of Juan's estate. The court found that both wives contributed in indeterminable amounts and proportions to the accumulations of the community. (*Vallera* v. *Vallera*, 21 Cal.2d 681, 683 [134 P.2d 761].) Since statutes and judicial decisions provide no sure guidance for the resolution of the controversy, the probate court cut the Gordian knot of competing claims and divided the estate equally between the two wives, presumably on the theory that innocent wives of practicing bigamists are entitled to equal shares of property accumulated during the active phase of the bigamy. No injury has been visited upon third parties, and the wisdom of Solomon is not required to perceive the justice of the result.

The judgment is affirmed.

Roth, P. J., and Compton, J., concurred.