[Civ. No. 13633. Fourth Dist., Div. Two. Jan. 21, 1975.]

Estate of HAROLD F. ATHERLEY, Deceased.
ANNETTE ATHERLEY, Petitioner and Appellant, v.
RUTH ATHERLEY, Objector and Respondent.

**COUNSEL**

Rager, Rager, Winstead & Bright and Henry F. Rager for Petitioner and Appellant.

Sullivan & Brown, William H. Sullivan and John Adler for Objector and Respondent.

## Opinion

KAUFMAN, J.—Annette Atherley (hereafter "Annette") appeals from determination of heirship in the estate of Harold Atherley (hereafter "Harold"). Harold died intestate September 2, 1969. Annette and Ruth Atherley (hereafter "Ruth") both filed for determination of heirship as the surviving spouse of Harold. Ruth was determined the surviving spouse. The community property was ordered distributed to Ruth, and Harold's separate property was ordered distributed one-third to her and two-thirds to her children. Annette was awarded her separate property, a putative one-half interest in certain property, and a joint tenancy survivorship interest in other property.

### Pertinent Facts

Harold and Ruth were married in 1933; Harold and Annette met in 1945. In 1947 Harold left Ruth for Annette, and they lived together until Harold's death in 1969. As described below, in 1961 Harold divorced Ruth, ex parte, in Juarez, Mexico. The next year Harold and Annette were married in Reno, Nevada. Harold and Ruth had two children;[1] Harold and Annette had no children. At all times, Harold, Ruth and Annette were domiciled in California.

After living in Santa Cruz approximately a year, Harold and Annette moved to the Los Angeles area in 1948. They resided in Los Angeles until 1961. While in Los Angeles both were employed and they pooled their earnings in various bank accounts. In 1961 they moved to Cherry Valley, where they lived until Harold's death.

In October 1961, Harold and Annette went to Juarez, Mexico, to obtain Harold's divorce from Ruth. They left Los Angeles on a Thursday night, obtained the divorce decree, and returned to Los Angeles by Monday morning. Ruth was served with the divorce papers, but she ignored them after an attorney informed her the divorce would be invalid in California. Subsequently in 1961, Ruth filed a divorce action in Los Angeles. This proceeding was withdrawn before it went to judgment.

The Mexican divorce was arranged by Mr. Newman, a Los Angeles attorney. After their return from Juarez, Harold and Annette met with Newman. He advised them that they had a valid divorce under the laws

---

[1]Both children survived Harold. Apparently, Ruth had no other issue, nor did she remarry.

of Mexico.[2] They apparently interpreted this to mean a valid divorce for all purposes, since Annette testified, "[Mr. Newman advised us] [t]hat the divorce was legal and that we could get married."

In 1962 Harold and Annette were married in Reno, Nevada. Harold's sworn affidavit of application for marriage admits his prior marriage to Ruth, but avers this marriage was dissolved by the Mexican divorce.

After their marriage, Harold and Annette began two improvements on realty in the Edgar Vineyard Tract of Cherry Valley.[3] They both contributed services to the construction of the improvements, and funds used to purchase both land and materials can be traced to their accumulated earnings. The improvements on one parcel were completed, and the parcel was sold. The improvements on the other parcel were incomplete when Harold died in 1969.

Harold suffered a heart attack in 1963. Afterwards, his income consisted of Social Security disability benefits, and the proceeds from the sale of realty. From 1961 on, Annette had no regular source of employment.

At Harold's death his estate consisted of realty in Cherry Valley—a parcel in the Cherry Valley Land and Water Company Subdivision, and the unsold land in the Edgar Vineyard Tract; a savings account in Southwest Savings and Loan; a savings account in Provident Federal Savings and Loan; and miscellaneous personalty. The history of this property is as follows.

The realty was acquired in 1959 and 1960, respectively, with accumulated earnings of Harold and Annette. Any interest of Ruth in the realty was transferred to Harold as his separate property in quitclaim deeds executed in 1963. Unimproved portions of the Edgar Vineyard property were sold in 1965 and 1967, and, as noted above, two parcels were improved by Harold and Annette. One of the improved parcels was sold in 1967. Cash proceeds from this sale ultimately ended up in the Provident Federal account. The remainder of the proceeds was in the form of a promissory note held by Harold and Annette in joint tenancy; this note passed to Annette by right of survivorship.

The Southwest account was opened in 1961, and the Provident Federal

---

[2]Annette testified to the meeting with Newman. Newman testified he remembered advising Harold, but he did not recall ever meeting Annette.

[3]The improved parcels constituted only part of their land in the tract.

account was opened in 1964. Both accounts were established with funds accumulated by Harold and Annette between 1948 and 1961. Apparently other deposits were made, but the record mentions only the proceeds from the Edgar Vineyard sales.

Essentially all the personalty was acquired with monies from the savings accounts.[4] The exceptions are a .22 caliber pistol and an adding machine, which Annette acquired separately and gave to Harold as gifts.[5]

At death Harold had four potential heirs: two wives and two children. The trial court held Ruth was the surviving spouse. Annette was held a putative spouse, and she was awarded a putative one-half interest in the value of the unfinished Edgar Vineyard improvement alone.[6] The trial court found the personalty to be the community property of Harold and Ruth. The rest of the estate, including all the remaining realty interests, was found to be Harold's separate property. The community property was awarded to Ruth. The separate property was divided one-third to Ruth and one-third to each child.

### Contentions

In substance, Annette contends: (1) Ruth is estopped to assert the invalidity of the Juarez divorce; (2) even if Ruth may assert the invalidity of the divorce, Annette is the surviving spouse; and (3) even if Ruth is entitled to share in the estate, the trial court erred in its disposition of the property.

[4]Ruth testified all the property in the estate was acquired before 1961. However, this is impossible since the personalty includes a 1967 pickup truck. Further, Ruth testified she had nothing to do with the acquisition of the personalty. In view of Annette's testimony that all the personalty was acquired after 1962, we construe Ruth's testimony to be a reference to the realty only. So restricted, her testimony appears entirely consistent with the rest of the evidence.

[5]A .28 gauge shotgun, a horse trailer, and a house trailer were excluded from the estate and awarded to Annette as her separate property. She testified the gun had always been hers, the horse trailer was purchased in her name, and the house trailer was owned by Harold and herself in joint tenancy. Ruth does not appeal this award, nor the award of the joint tenancy promissory note (see text, *ante*). Annette has no other assets outside her asserted interest in the estate.

[6]There was no express finding of putative status. However, this finding is implicit, since the court awarded Annette a putative spousal interest in the value of the incomplete improvement. Annette was denied any interest in the rest of the estate since it was traceable to the period of their meretricious relationship. Note a meretricious relationship exists if unmarried persons knowingly live together. (*In re Marriage of Cary*, 34 Cal.App.3d 345, 349 [109 Cal.Rptr. 862].) A putative relationship exists if one or both parties believe in good faith, albeit incorrectly, that there is a valid marriage. (*Vallera v. Vallera*, 21 Cal.2d 681, 683-684 [134 P.2d 761].)

*Discussion and Disposition*

■ There is no question that the Juarez divorce has no force in California,[7] and the issue is not contested by the parties. The question remains, however, whether Ruth may raise the invalidity of the divorce. Annette contends Ruth is equitably estopped to assert its invalidity. We do not agree.

Estoppel has been used in this state to validate a second marriage. Usually it is applied when the party estopped has procured the invalid divorce, or relied on the validity of the divorce by remarrying. (See *Spellens* v. *Spellens,* 49 Cal.2d 210, 217-222 [317 P.2d 613].)

Estoppel has also been applied in cases where the estoped party ". . . slept on her property rights year in and year out and who, by her silence and acquiescence, allowed the rights of a third party to intervene." (*Brown* v. *Brown,* 274 Cal.App.2d 178, 190 [79 Cal.Rptr. 257].) In *Brown,* there was an invalid Mexican divorce. The first wife waited 30 years before asserting a claim against property accumulated by Mr. Brown and his second wife. In the interim, she acquiesced in her husband's use of the second wife's separate property to build up the purported community property, and accepted monthly support payments from him. Further, the first Mrs. Brown had not previously indicated she challenged the relationship between her husband and his second wife. The court held her estopped to claim a community property interest. *Estate of Shank,* 154 Cal.App.2d 808 [316 P.2d 710], found an estoppel where the appellant Worley had not ascertained or attacked the validity of a Mexican divorce, and had acted "as 'a single man.' " (154 Cal.App.2d at p. 811.)

■ Estoppel, however, applies only ". . . to prevent a person from asserting a right . . . where, because of his conduct, silence or omission, it would be unconscionable to allow him to do so." (*Brown* v. *Brown, supra,* 274 Cal.App.2d at p. 188.) ■ We do not find it unconscionable to allow Ruth to assert the invalidity of the Juarez divorce.

---

[7]Civil Code, sections 5001 and 5002 state:

"5001. A divorce obtained in another jurisdiction shall be of no force or effect in this state, if both parties to the marriage were domiciled in this state at the time the proceeding for the divorce was commenced."

"5002. Proof that a person hereafter obtaining a divorce from the bonds of matrimony in another jurisdiction was (a) domiciled in this state within 12 months prior to the commencement of the proceeding therefor, and resumed residence in this state within 18 months after the date of his departure therefrom, or (b) at all times after his departure from this state, and until his return maintained a place of residence within this state, shall be prima facie evidence that the person was domiciled in this state, when the divorce proceeding was commenced."

The most that can be said is that Ruth acquiesced, to some extent, in the divorce. In this regard, she lived apart from Harold, supported herself completely out of her separate property, and had relatively cordial relations with Harold and Annette between 1963 and 1969.

On the other hand, she did not passively sit by after learning of the Juarez action. Upon being served with the divorce papers, she consulted her attorney. We infer that but for his advice, she would have done more than simply ignore the Juarez proceedings.

Especially significant are the quitclaim deeds executed in 1963. These deeds were prepared by Harold. In them, Ruth permitted herself to be denominated "a married woman." More importantly, she personally lined out a portion of each deed reading: "This deed is given for the purpose of carrying out the terms of an Oral Property Settlement Agreement between the Grantor and Grantee." Ruth testified, "I . . . told Harold I wouldn't sign it as a property settlement, but just to give him the property to sell. And that was—all we did there so he could sell the property. That was the reason."

Ruth held herself out as married to Harold. The filing of her Los Angeles divorce action indicates she considered herself married to Harold. The withdrawal of that action implies she desired to remain so married. She filed her income tax returns as a married person, filing separately. Further, she was friendly with Harold and Annette only after his heart attack, and only out of concern for his health.

 Estoppel is applied to prevent a person from acting " '. . . in a manner inconsistent with his former position or conduct to the injury of another.' [Citations.]" (*Brown* v. *Brown, supra,* 274 Cal.App.2d at p. 189.) Guided by this principle, we do not find an estoppel in this case.[8]

 Annette contends that even if the invalidity of the Juarez divorce was properly before the court, the trial court erred in finding Ruth the surviving spouse. We do not agree.

 Annette relies on the presumption of validity of ceremonial marriage. (Evid. Code, §§ 605, 606, 663.) "When a person has entered

[8]Harold tacitly conceded Ruth's position. A quitclaim deed to her executed in 1964 reads in part: "I, Harold F. Atherley, husband of Ruth E. Atherley, do hereby release and quitclaim . . . ."

into two successive marriages, a presumption arises in favor of the validity of the second marriage . . . and the burden is upon the party attacking the validity of the second marriage to prove that the first marriage had not been dissolved by the death of a spouse or by divorce or had not been annulled at the time of the second marriage. [Citations.]" (*Vargus* v. *Superior Court,* 9 Cal.App.3d 470, 473-474 [88 Cal.Rptr. 281]; *Estate of Smith,* 9 Cal.3d 74, 80-81 [106 Cal.Rptr. 774, 507 P.2d 78] [quoting the same passage].) This presumption is rebuttable, but the burden of proof is heavy, since the party attacking the second marriage must prove a negative fact.

A number of California cases seem to suggest there is only one way to prove the first marriage had not been dissolved or annulled: a search of the records of every jurisdiction where one of the parties may have resided. (See e.g., *Estate of Goldberg,* 203 Cal.App.2d 402, 406 [21 Cal.Rptr. 626]; *Bancroft* v. *Bancroft,* 9 Cal.App.2d 464, 469-470 [50 P.2d 465] [declining to apply the presumption on other grounds].) However, *Vargus* v. *Superior Court, supra,* pointed out no court had ever held such searches mandatory. (9 Cal.App.3d at pp. 475-476, 477.) Rather, " '. . . any other form of reasonable evidence, whether circumstantial, evidentiary or documentary when presented must be weighed in the customary fashion to determine whether it is sufficient to overcome the presumption.' " (9 Cal.App.3d at p. 475, quoting with approval the trial court's opinion.) *Vargus* concluded, and we agree, that while a record search may be necessary in some cases, ". . . in a particular case other evidence, if cogent and compelling, may be sufficient to meet the acknowledged heavy burden imposed upon the party attacking [the second marriage] . . ." (9 Cal.App.3d at p. 477.)

 Our review is confined to determining if there is substantial evidence to support the trial court's findings. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].) The record reveals Harold's sworn affidavit of application for marriage license relied solely on the Juarez decree to establish a divorce from Ruth. In addition, both Annette and Ruth testified they knew of no other divorce or annulment decree. Thus the trial court had before it sworn testimony from all persons involved regarding dissolution of the first marriage prior to the second marriage. In effect, all agreed the invalid divorce was the only completed attempt to dissolve Harold's marriage to Ruth. We find this to be substantial evidence supporting the trial court's determination that the presumption was rebutted. Therefore, Ruth was the only woman validly married to Harold, and she is the surviving spouse.

■ Finally, Annette contends the trial court erred in the disposition of the estate. We agree.

The trial court held Annette had no interest in assets of the estate traceable to the period when Annette and Harold had only a meretricious relationship. This holding may not be maintained.

The uncontradicted evidence was that Annette contributed funds to the acquisition of such assets. Without doubt, she thereby acquired a property interest protected by law. (*Keene* v. *Keene,* 57 Cal.2d 657, 662 [21 Cal.Rptr. 593, 371 P.2d 329]; *Vallera* v. *Vallera, supra,* 21 Cal.2d 681, 685 [134 P.2d 761].)

California law regarding meretricious spousal interests has undergone change in recent years. Under prior law, the interest was proportional to the spouse's contribution[9] to acquisition of the property.[10] (*Keene* v. *Keene, supra,* 57 Cal.2d at p. 662.) However, the new Family Law Act (Civ. Code, §§ 4000-5174), as applied in *In re Marriage of Cary, supra,* 34 Cal.App.3d 345 [109 Cal.Rptr. 862], altered this rule.

The threshold question is the applicability of the Family Law Act. The act was effective January 1, 1970, after Harold's death. The Legislature, however, gave the act certain retroactive effect: "This act . . . shall apply . . . [where] the action is not one in which an interlocutory judgment may be entered, . . . to all actions and proceedings filed on or after January 1, 1970." (Stats. 1969, ch. 1609, p. 3351, at pp. 3360-3361.) The petition for determination of heirship in this case was filed October 16, 1970, and thus the Family Law Act applies. For its impact, we turn to *In re Marriage of Cary, supra,* 34 Cal.App.3d 345.

*Cary* involved a man and woman who lived together, unmarried, for more than eight years. They held themselves out as man and wife, had four children, and otherwise conducted themselves as though married. In 1971, the man petitioned for " 'Nullity of the marriage pursuant to Civil Code section 4001.' " The issue on appeal was the woman's rights in property acquired during the meretricious relationship. All such property was traceable to the man's earnings during that period. (34 Cal.App.3d at p. 348.)

---

[9]Contribution was limited to money or property of value, and did not include personal services. (*Keene* v. *Keene, supra,* 57 Cal.2d at pp. 663-668.)

[10]Alternatively, agreements regarding division of property were enforced. (See, e.g., *Garcia* v. *Venegas,* 106 Cal.App.2d 364 [235 P.2d 89].)

*Cary* first noted prior California cases had shown little concern for meretricious spousal interests in regard to property rights which are protected when there is a valid marriage. In contrast, putative spousal interests were generally awarded equally, without regard to contribution. " 'Equitable considerations' were not present [in the meretricious case,] the courts held, because of the 'guilt' of both of the parties. [Citations.]" (34 Cal.App.3d at p. 350.)

However, the Family Law Act eliminated fault or guilt as grounds for grant or denial of divorce, refusal of alimony, and unequal division of marital property. In particular, the court emphasized, in a putative marriage a "guilty" spouse is treated the same as an "innocent" spouse; that is, the property at issue is divided as if the marriage were valid (see Civ. Code, § 4452). "Sections 4452, 4509, and 4800 assure that the parties, without 'punishment' or 'reward' to either, shall receive an equal division of that which would have been community property had they been validly married." (34 Cal.App.3d at pp. 351-352.)

The court then rejected the argument there should be a different result in a meretricious relationship:

"Giving effect to such an argument would lead to an unreasonable result and frustrate the obvious objective of the Act. We should be obliged to presume a legislative intent that a person, who by deceit leads another to believe a valid marriage exists between them, shall be legally guaranteed half of the property they acquire even though most, or all, may have resulted from the earnings of the blameless partner. At the same time we must infer an inconsistent legislative intent that two persons who, candidly with each other, enter upon an unmarried family relationship, shall be denied any judicial aid whatever in the assertion of otherwise valid property rights.

" . . . . . . . . . . . . . . .

"By the Family Law Act the Legislature has announced it to be the public policy of this state that concepts of 'guilt' (and punishment therefor) and 'innocence' (and reward therefor) are no longer relevant in the determination of family property rights, whether there be a legal marriage or not, and if not, regardless of whether the deficiency is known to one, or both, or neither of the parties.

" 'It is for the Legislature . . . to choose between conflicting policies, . . .' [Citation.] *The declaration of public policy is essentially a legislative*

*function and although the courts occasionally invade that field, a declaration by the Legislature is paramount. . . .'* [Citation.]

"It therefore becomes our duty to give expression to the public policy expressed by the Family Law Act. We hold, as to the issue before us, that the Act supersedes contrary pre-1970 judicial authority.

"It follows that the trial court properly disregarded evidence of the 'guilt' of the parties to the instant action. Having done so, it was obliged to divide their property evenly, according to the dictate of Civil Code section 4800.

". . . . . . . . . . . . . . .

"As we have pointed out, under application of equitable principles a result contrary to our holding was consistently reached prior to the Family Law Act. But our holding in no way conflicts with those high principles. ' "The jurisdiction of courts of equity is not . . . diminished when by statutory changes some rights cease to exist and certain cases which courts of equity once entertained can no longer arise. [The equity power of courts] was not intended as a limitation upon the power to legislate upon the rights of persons." ' [Citations.]" (34 Cal.App.3d at pp. 352-353.) (Original italics.)

We agree with *Cary*'s holding that a meretricious spouse now has the same property rights as a putative spouse.[11] All meretricious relationships, however, do not automatically trigger this rule. *Cary* predicated its decision on the Family Law Act, which provides, inter alia, for determination of *family* property rights. Thus, ". . . the criteria for application of the rule . . . is much more than . . . an unmarried living arrangement between a man and woman. The Family Law Act . . . requires . . . there be established not only an ostensible marital relationship but also an actual family relationship, with cohabitation and mutual recognition and assumption of the usual rights, duties, and obligations attending marriage." (34 Cal.App.3d at p. 353.)

[11]This result receives implicit support from more recent changes in California statutes. Pre-*Cary* case law did not consider meretricious spousal services, such as cooking and housekeeping, valuable contributions to the acquisition of assets. (See fns. 9 and 10, and accompanying text, *ante.*) This discriminates against the woman, since very often the man is the sole contributor of monies and property of value. (See *Vallera* v. *Vallera, supra,* 21 Cal.2d at pp. 686-687, Curtis, J. dissenting; Note, *Illicit Cohabitation: The Impact of the Vallera and Keene Cases on the Rights of the Meretricious Spouse* (1973) 6 U.C.Davis L. Rev. 354.) Thus one spouse was favored solely due to the typical sex-based division of labor within the family unit. However, extensive amendments to the Civil Code and the Welfare and Institutions Code (Stats. 1973 enactments, chs. 987, 999),

In this case, the evidence was uncontradicted that during their meretricious relationship Harold and Annette cohabited, pooled resources, resided together continuously, contributed services to joint projects,[12] and otherwise conducted business as if they were man and wife. They clearly had a family relationship and fall within the rule set forth in *Cary.*

All the property in the estate was acquired during either the putative or the meretricious relationship. Further, all the property is traceable to funds accumulated by Harold and Annette after 1948. Annette, therefore, has the equivalent of a putative spousal interest in the entire estate. The extent of her interest is determined by rules governing competing legal and putative spousal claims.

When both legal and putative spouses claim an interest in an estate, various legal theories have been propounded to divide the property. (See *Estate of Vargus,* 36 Cal.App.3d 714, 717-718 [111 Cal.Rptr. 779].) We find most persuasive the theory enunciated in *Sousa* v. *Freitas,* 10 Cal.App.3d 660, 665-666 [89 Cal.Rptr. 485] (hg. den.).

*Sousa* held one-half the marital property belonged to the putative spouse outright. Only the other half, representing the decedent's interest, was subject to testate or intestate succession. *Sousa* treated the putative relationship like a partnership or a joint venture, and ". . . accumulated property was held in effect in tenancy-in-common in equal shares. Upon death of the husband, only his half interest is considered . . . property, to which the rights of the lawful spouse attach." (10 Cal.App.3d at p. 666, fn. omitted.) Since the decedent in *Sousa* had willed his half of the community property to the putative spouse, she received three-fourths of the estate. The other one-fourth was owned outright by the legal wife, the surviving spouse. (See Prob. Code, §§ 201 and 201.5.)

Applying *Sousa* to this case, we find that excepting the adding machine and the .22 caliber pistol,[13] Annette is entitled to one-half the total estate: the savings accounts; the realty, including the improve-

___

effective January 1, 1975, implement the public policy that sex is an improper basis for discrimination regarding family property rights. (See, e.g., Civ. Code, §§ 5105, 5125, 5127.) It would be inconsistent with this policy to allow a meretricious husband, or those who take through him, advantage over a meretricious wife simply because in our present stage of social development the husband is usually the "breadwinner."

[12]E.g., improvements on realty no longer in the estate.

[13]Annette testified she purchased these items and gave them to Harold. Therefore, she no longer has any interest in them. (Cf. Civ. Code, § 5108.)

ment;[14] and the personalty. She is also entitled to all the property excluded from the estate as hers by separate ownership or joint tenancy survivorship.

The rest of the estate is property of the legal marriage, and passes by intestate succession. Ruth has an interest in this property as the surviving spouse, but the extent of her interest in a given item depends on whether it is community property or separate property of Harold. (See Prob. Code, §§ 201, 221.) Since the children are not parties to the appeal, since the characterization of the property is not attacked by Ruth or Annette, and since Ruth states: "It is immaterial to respondent into which of . . . those two categories the property is found to fall . . .," it is not necessary for us to consider any error in the characterization of the property. Thus with respect to the property of the legal marriage, we do not alter the finding that the savings accounts and the realty are Harold's separate property, and the personalty is community property.

Judgment is reversed in part. Excepting the adding machine and the .22 caliber pistol, the trial court is directed to enter judgment in favor of Annette to the total of one-half the estate. The court is also directed to award Annette what was held hers by separate ownership or joint tenancy survivorship. Otherwise, judgment is affirmed.

Gardner, P. J., and Kerrigan, J., concurred.

A petition for a rehearing was denied February 10, 1975, and respondent's petition for a hearing by the Supreme Court was denied March 26, 1975.

---

[14]Note Ruth's quitclaim deeds, *ante,* have no impact on Annette. Ruth's community property interest was coextensive with Harold and independent of Annette's interest in the realty. The deeds specifically recited that Harold was to receive Ruth's interest as his separate property. Thus the interest acquired thereby did not become familial property of Harold and Annette. (Cf. Civ. Code, § 5108.) The quitclaim deeds merely altered the character of Harold's interest in relation to Ruth. They did not increase or decrease Annette's rights in the property.