[Civ. No. 14317. Third Dist. June 27, 1975.]

CLAIRE D. BECKMAN, Plaintiff and Appellant, v.
KENNETH W. MAYHEW, Defendant and Respondent.

**COUNSEL**

Skow & Jones and Gilbert F. Jones for Plaintiff and Appellant.

Darrell W. Stevens for Defendant and Respondent.

**OPINION**

**FRIEDMAN, Acting P. J.**—This appeal presents the contending property claims of a woman and man at the termination of a nonmarital family relationship[1] which had lasted almost 12 years. The appeal encounters a legal syndrome consisting of two decisions of the California Supreme Court, *Vallera* v. *Vallera* (1943) 21 Cal.2d 681 [134 P.2d 761];

---

[1] We use the term *nonmarital family relationship* to describe a man and woman's indefinitely continued assumption of family life without a marriage ceremony and without good faith belief that they are married. Our descriptive term applies to a relationship which a number of decisions term *meretricious*.

*Keene* v. *Keene* (1962) 57 Cal.2d 657 [21 Cal.Rptr. 593, 371 P.2d 329], and two recent decisions of the California Courts of Appeal, *In re Marriage of Cary* (1973) 34 Cal.App.3d 345 [109 Cal.Rptr. 862], and *Estate of Atherley* (1975) 44 Cal.App.3d 758 [119 Cal.Rptr. 41].

In *Vallera* v. *Vallera, supra,* the court held that the female party gains no interest in property accumulated during the relationship; at its termination she is entitled to share in the accumulated assets only if there has been an express agreement to pool funds or, in the absence of agreement, she has contributed funds toward the acquisition of the property. A minority of the court protested that the majority opinion denied the woman credit for the value of her contributions as house-keeper and cook.

In *Keene* v. *Keene* the majority of the court confirmed *Vallera,* making explicit the denial of monetary credit for the domestic tasks of the woman.

*In re Marriage of Cary,* a decision of the Court of Appeal, First District, Division One, holds that the principle of equal division of marital assets decreed by the Family Law Act (effective Jan. 1, 1970) applies also to a nonmarital family relationship; that on termination of the latter, the couple's accumulated assets are to be evenly divided. In effect, *Cary* holds (34 Cal.App.3d at p. 353) that the Family Law Act abolished the *Vallera-Keene* rule.

*Estate of Atherley,* a decision of the Court of Appeal, Fourth District, Division Two, expresses agreement "with *Cary's* holding that a meretricious spouse now has the same property rights as a putative spouse." (Fn. omitted.)(44 Cal.App.3d at p. 769.) In addition to the Family Law Act, the *Atherly* court cited amendments to the Civil Code (effective Jan. 1, 1975) terminating traditional male dominance in the control of community property.

In this case plaintiff is the female member of the rescinded relationship. She appeals from a judgment denying her any interest in a parcel of real estate on which she and defendant lived for almost 12 years.

Plaintiff and defendant began living together on the property in June 1959. They were not married, knew that they were not married and had no intention of marrying. Their marriage would have caused plaintiff to lose a government pension of $200 to $230 a month. In social matters the

parties made no pretense of marital status. In financial matters, they used their individual last names for some purposes and used the man's last name for other purposes. They filed joint income tax returns and had a joint checking account in which plaintiff adopted defendant's last name. Defendant made a will bequeathing all his property to plaintiff.

Defendant and his former wife had embarked on purchase of a real estate parcel for $5,200 in 1957. It was quitclaimed to defendant upon their divorce in 1958. At that time defendant owed $4,000 on the property. When plaintiff and defendant commenced living together, they moved into a relatively makeshift structure on the property. The $4,000 debt on the real estate was paid off by checks drawn on the joint checking account. Defendant built a new residence on the property, performing most of the labor himself. The court found that the building materials were purchased with money from the joint checking account and that none of plaintiff's funds were expended on the real estate. By the time the parties decided to separate, the property had a value in the $45,000 to $47,500 range.

During the existence of the relationship, plaintiff performed the housework and cooking. Defendant was employed and received earnings approximating $7,000 per year. The court found that defendant had deposited most if not all his earnings in the joint checking account; that the parties had no agreement to pool their income or assets. On conflicting evidence the trial court found that little, if any, of plaintiff's pension money was deposited in the joint checking account or used·for the parties' mutual benefit. The court concluded that plaintiff had no interest in the real estate.

Plaintiff·contends that no substantial evidence supports the findings that the building materials were purchased with funds from the joint checking account and none of plaintiff's funds were contributed to the real estate. We sustain that contention. Defendant bought some of the building material from his earnings, which had been deposited in the joint checking account. About two-thirds of the material was purchased with a fund of $10,000 lent by Gene Countryman, a friend of defendant. Defendant explained that Countryman had offered to lend him the money; that he, defendant, insisted on signing a note; that he wanted plaintiff to sign the note too, in order to protect Countryman should defendant die and plaintiff be left with the estate. He testified, "I figured that she might as well be able to take care of Gene with the money that we owed him."

 The findings make no reference to the Countryman loan. Contrary to the findings, the evidence is that most of the building materials were financed by that loan and not bought from defendant's earnings. This circumstance does not mean that plaintiff is now entitled to share in the real estate in exchange for her signature on the Countryman note. She has made no contribution toward repayment of the note. Indeed, at the trial defendant testified that he still owed Countryman about $9,000 on the note. Defendant claimed primary or sole liability on that note. There is no evidence of a collateral agreement negativing plaintiff's indebtedness. That plaintiff will ever be called upon to pay anything on the note is only a speculative contingency. To give her credit for future payments to be made by defendant would be most inequitable. Plaintiff is entitled, at most, to protection against the contingency that Countryman might enforce the note against her.

 A court of equity may impress property with an equitable lien to prevent unjust enrichment. (*Jones* v. *Sacramento Sav. & Loan Assn.,* 248 Cal.App.2d 522, 529-530 [56 Cal.Rptr. 741].) Plaintiff is entitled to an equitable lien on the real estate in order to protect her in the event she is called upon to pay any part of the debt. Unless Countryman chooses to release plaintiff from her liability on the note, the judgment should be modified to provide such an equitable lien.

 We reject plaintiff's claim to credit for building material expenditures from the joint checking account. She relies upon the rebuttable presumption that a deposit of money in a joint checking account creates a joint ownership. (See Fin. Code, § 852; *Schmedding* v. *Schmedding,* 240 Cal.App.2d 312, 316 [49 Cal.Rptr. 523].) The claim fails, for there was evidence to rebut the presumption. Defendant testified, in effect, that he did not intend his deposit of earnings in the joint checking account as a gift; rather, he testified that he created the joint checking account for the purpose of facilitating the payment of bills during his absences.

 Finally, relying on *In re Marriage of Cary, supra,* plaintiff claims entitlement to one-half the value of the real estate. *Estate of Atherley, supra,* decided after plaintiff's briefs had been filed, provides additional support for her claim.

We decline to follow the *Cary* and *Atherley* decisions, believing ourselves bound by the California Supreme Court's decisions in *Vallera* and *Keene.* We do not agree with the *Cary* court's expressed belief that the Legislature intended to abrogate the *Vallera-Keene* rule when it

adopted the Family Law Act. The Family Law Act deals with divisions of property at the termination of solemnized marriages and (in Civ. Code, §§ 4452 and 4455) at the termination of putative marriages. Neither in terms nor by implication does it deal with nonmarital family relationships of the kind involved in *Vallera, Keene* and the present case. (See 9 U.S.F.L.Rev. 186.) If indeed the Family Law Act has the effect accorded it by the *Cary* decision, the Legislature selected an extraordinarily indirect, extremely devious and remarkably subtle means of repealing a well-established and well-known rule of substantive law.

Nor are we impressed by the *Atherley* court's reliance upon the recent changes in California community property law. Again, we cannot ascribe to the Legislature an intent to abrogate the *Vallera-Keene* rule in such a devious and covert manner. There is more logic in the view that recent changes in California domestic relations legislation ignored rather than changed the law dealing with the so-called "meretricious" relationship.

We fully recognize the viewpoint expressed by the dissenting opinions in *Vallera* and *Keene.* We recognize the charge of sex discrimination leveled at the *Vallera-Keene* rule. (*Keene* v. *Keene, supra,* 57 Cal.2d at p. 668, dissent of Peters, J.; 6 U.C.Davis L.Rev. 354.) We recognize that developing social attitudes on the score of equality between the sexes and a responsive array of statutory and decisional developments, federal and state, may portend the crystallization of a public policy inimical to the *Vallera-Keene* doctrine. We are not permitted to violate stare decisis for the sake of straws in the wind. Our duty as an intermediate appellate court is to follow the decisional law laid down by the state Supreme Court. We violate jurisdictional bounds when we do otherwise. (*Auto Equity Sales, Inc.* v. *Superior Court,* 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) The trial court correctly denied plaintiff credit for her domestic services.

The judgment is reversed and the cause remanded to the trial court with a direction to inquire and make a finding as to plaintiff's then existing liability on the Countryman note and, in case such liability exists, to award plaintiff a lien on the real estate to secure her for whatever sums she may in the future pay on the Countryman note. Except in that one respect, the findings and conclusions of the trial court are sustained. Each side will bear its own costs on appeal.

**PARAS, J.**—I concur in the decision and substantially in the reasoning of Justice Friedman; my sole disagreement is with the dictum contained in his next to last paragraph.

I recognize no "developing social attitude" which should portend the enunciation of a public policy inimical to the *Vallera-Keene* doctrine. Alone out of the seven *Keene* participants, Justice Peters mistakenly saw the doctrine as discriminating in favor of the male gender (*Keene* v. *Keene* (1962) 57 Cal.2d 657, 668 [21 Cal.Rptr. 593, 371 P.2d 329]); the other six recognized the reality that it favors neither sex, but extends its touch equally to both. Indeed the majority opinion expressly notes cases applying the rule to circumstantially similar claims by men to a share of earnings or accumulations of women (*Id.* at p. 662, fn. 2). Thus the modern trend toward increased awareness of the equality of the sexes surely furnishes no basis for altering the *Vallera-Keene* doctrine. On the contrary, it fortifies it.

The doctrine was spawned by concepts of morality, not chauvinism. By protecting one's actual contribution to the other's nominal property and by recognizing agreements to share, both express and implied (*id.,* p. 662), the doctrine does substantial equity to the nonworking participant. But it stops there. It declares that one party to a meretricious relationship does not thereby automatically become entitled to a share of the other's earnings and accumulations, solely because of the relationship. It thus discourages meretricious relations and promotes a public policy favoring legally binding marriages, with consequent sounder and more secure familial ties.

This public policy has not changed and should not change. There is no social attitude, nor any "responsive array of statutory and decisional developments," which prefers informal living arrangements to solemnized marriage, nor any reason for us to suggest one. The fact that historically many couples have chosen to live together meretriciously, and that many do so now, hardly endows the practice with the dignity of a "developing social attitude."

In short I offer no apology for our adherence to the *Vallera-Keene* rule, which I consider wise and sound; I disavow the dictum to the contrary.

**EVANS, J.**—I join in the concurring opinion of Justice Paras.