[Civ. No. 47057. Second Dist., Div. Five. June 15, 1976.]

*ERASTO MENCHACA et al., Plaintiffs and Respondents, v.
FARMERS INSURANCE EXCHANGE et al.,
Defendant and Appellant.

*Reporter's Note: This case was previously entitled "Menchaca v. Hiatt."

118

**COUNSEL**

Early, Maslach, Boyd & Leavey and Harry Boyd for Defendant and Appellant.

Clarence E. Blair and Alan Steinhardt for Plaintiffs and Respondents.

[June 1976]

- **OPINION**

**STEPHENS, Acting P. J.**—In a complaint filed on June 1, 1973, it was alleged that on January 7, 1973, Erasto Menchaca and Marina Lara, while pedestrians in a marked crosswalk, were injured when they were struck by an automobile being negligently operated by A. Arellano. At the time of the accident, Arellano was not covered by an automobile liability insurance policy. Menchaca, however, had been issued such a policy by Farmers Insurance Exchange[1] (Farmers) covering the period in question[2] and containing an uninsured motorist endorsement.

After Lara's motion to bifurcate pursuant to Code of Civil Procedure section 597, it was ordered that "the issue of uninsured motorist insurance coverage will and hereby is bifurcated from the other issues in this matter and will be tried separately from all other issues." A trial on this issue was held without a jury.

During the trial, it was established that all claims by Menchaca against Farmers had been settled under the terms of his policy. To determine whether Lara was also covered by the policy, the following two provisions were noted by the trial court: (1) Under Part I of the policy governing "Liability Insurance," "Named Insured" was defined: "If the insured named in Item I of the Declarations is an individual, the term 'named insured' includes his spouse if a resident of the same household." (2) Under Part II, dealing with "Benefits for Bodily Injury Caused by Uninsured Motorists," the following provision was made: "Insured means (1) the named insured or a relative, (2) any other person while occupying an insured motor vehicle, and (3) any person, with respect to damages he is entitled to recover because of bodily injury to which Part II applies sustained by an insured under (1) or (2) above." It was stipulated that Lara was a member of the household; it was also determined that neither party had other spouses, Menchaca having obtained a legal divorce and Lara's husband having died.

Lara testified that at about 6 o'clock "in the afternoon" of January 7, 1973, she was involved in an accident while crossing at the intersection of

---

[1]In the complaint, Farmers Insurance Exchange was referred to as "Farmers Insurance Group."

[2]The copy of the policy attached to the complaint and introduced into evidence at trial became effective on November 15, 1971, but expired on March 26, 1972. However, at the trial the attorney for Menchaca and Lara stated: "The expiration date on that policy on the face sheet is prior to the date of the loss, however, we are stipulating that the same coverages were in effect on the date of the loss."

1st and St. Louis Streets in Los Angeles. At that time, Lara was leaving a movie theater and was proceeding to "our car." She intended to make no stops on the way to the car and, upon entering the vehicle, intended to go home.

With respect to her relationship with Menchaca, she testified as follows: In 1968, she had begun living with Menchaca; they had resided together at their present address for two years. When she started living with Menchaca, she was working. She stopped work voluntarily during a period from "the last of '71 up to '72." While she was unemployed, the two lived on Menchaca's earnings.

Although Lara's social security card (applied for by her in 1944), her paychecks, and her bank account were in the name "Marina Lara," the utilities were listed in Menchaca's name. The money used to pay all of the rent, food, and utilities was Menchaca's. Lara spent her money on clothes for herself and presents for her children and grandchildren. Lara cooked the meals, cleaned the house, and washed the clothes. The couple had married friends to whom they were known as "Mr. and Mrs. Menchaca." The question of Lara's name had never arisen with respect to her children; to her relatives, Lara had introduced Menchaca as her "husband." She has continued to live with Menchaca and testified that she holds herself out to be his wife and he holds himself out to be her husband.

Menchaca, who indicated that he was born on July 26, 1926, testified that he had lived with Lara as man and wife since 1968. Menchaca also stated:

"THE WITNESS: I live with a lady. I don't know how you would take it. She is my wife or what.

"THE COURT: How does he take it [speaking to an interpreter]?

"THE WITNESS: Living together for quite a while now. I consider her my wife."

Menchaca further testified that he and Lara had never left California together, but that he had returned alone to Mexico to attend to matters involving his sons. When shown a savings account passbook, Menchaca indicated that it represented "some money that the lady and I had together." The trial court noted: "The title appears to be the same, that is

with respect to the depositors, Lara and Erasto Menchaca." Menchaca also stated that he paid for all of the rent, food, and utilities and that "That's the custom we have in Mexico." He added: "The man is supposed to work."

Portions of prior depositions of Menchaca and Lara were read into evidence. With respect to Menchaca, the following had taken place: " 'Q. Has anyone ever told you that a common-law marriage is legal in California? [¶] A. No, I have never asked.' " Menchaca was also asked whether he and Lara had ever gone through a marriage ceremony; he replied: " 'No, we are not married. It is a common-law.' " In parenthesis, the interpreter had noted: " 'Free union, that is what he calls it.' " Lara was asked the following questions: " 'Q. You have indicated that you have been living with Mr. Menchaca for a period of over two years. Have you considered yourself his wife? [¶] A. Yes. [¶] Q. What caused you to believe that? [¶] A. Well, he has taken care of me and we have lived that long together. [¶] Q. Well, have you ever made inquiry as to whether or not common-laws are recognized in California? [¶] A. No. [¶] Q. Has anybody led you to believe— [¶] A. No. [¶] Q. —that they are? [¶] A. No.' " Lara also stated that she had never gone through a marriage ceremony with Menchaca.

After completion of the trial, the court made the following findings of fact:

"4. That on January 7, 1973, and for several years prior thereto, plaintiff, MARINA LARA and ERASTO MENCHACA had been living together in the same household, as husband and wife without benefit of a formal marriage ceremony.

"5. That as of January 7, 1973, there existed between plaintiff, MARINA LARA and ERASTO MENCHACA, an actual family relationship, with cohabitation and mutual recognition and assumption of the usual rights, duties and obligations attending marriage."

From these findings, the trial court concluded that, on January 7, 1973, Lara was "the spouse" of Menchaca, living in the same household, and that, therefore, she was afforded uninsured motorist coverage under the policy issued by Farmers to Menchaca.[3] It was also ordered that Farmers

---

[3]Although the trial court referred to the policy issued on November 21, 1971, the trial court also found that "said policy was in full force and effect at all times relevant hereto, and specifically on January 7, 1973."

"is liable to . . . Lara, for damages as a result of her pending uninsured motorist claim in an amount to be agreed upon between the parties, or, in the event of disagreement, by arbitration."

## DISCUSSION

██ The first question to be resolved is whether or not the order of the trial court establishing Lara's status under the policy was appealable. The motion to bifurcate was apparently supported by section 597 of the Code of Civil Procedure, which governs separate trials on special defenses.[4] In construing the provisions of section 597, the court in *Woodhouse* v. *Pacific Elec. Ry. Co.,* 112 Cal.App.2d 22, 25 [245 P.2d 701], made the following observations: "When, as in the present case, the answer sets up special defenses not involving the merits of plaintiff's cause of action but constituting a bar to the prosecution thereof, and the decision of the court is in favor of the plaintiff, the action is in the same status it would have been had the special defenses not been pleaded, —and a judgment should not be rendered or entered. [Citation.] The action then proceeds to trial on the issues made by the complaint and the other defenses pleaded,—and, on their determination, a judgment is rendered and entered. [Citation.] In such event the decision of the court on the special defenses tried and all rulings on the trial of them are deemed excepted to and, by the express language of section 597, may be

---

[4]Code of Civil Procedure section 597 provides in pertinent part as follows: "When the answer pleads that the action is barred by the statute of limitations, or by a prior judgment, or that another action is pending upon the same cause of action, or sets up any other defense not involving the merits of the plaintiff's cause of action but constituting a bar or ground of abatement to the prosecution thereof, the court may, upon the motion of either party, proceed to the trial of such special defense or defenses before the trial of any other issue in the case, and if the decision of the court, or the verdict of the jury, upon any special defense so tried (other than the defense of another action pending) is in favor of the defendant pleading the same, judgment for such defendant shall thereupon be entered and no trial of other issues in the action shall be had unless such judgment shall be reversed on appeal or otherwise set aside or vacated; and where the defense of another action pending is sustained (and no other special defense is sustained) an interlocutory judgment shall be entered in favor of the defendant pleading the same to the effect that no trial of other issues shall be had until the final determination of such other action, and the plaintiff may appeal from such interlocutory judgment in the same manner and within the same time as is now or may be hereafter provided by law for appeals from judgments. If the decision of the court, or the verdict of the jury, upon the special defense or defenses so tried shall be in favor of the plaintiff, trial of the other issues shall thereafter be had upon the motion of either party, and judgment shall be entered thereon in the same manner and with the same effect as if all the issues in the case had been tried at one time. In such event any and all decisions or verdicts upon such special defense or defenses, and all rulings on the trial thereof shall be deemed excepted to and may be reviewed on motion for a new trial or upon appeal from such judgment."

reviewed on motion for a new trial or upon an appeal from the judgment.

" . . . . It is only where a special defense is of another action pending, and such defense only is sustained, that an interlocutory judgment is entered to the effect that no trial of other issues shall be had until the final determination of such other action. [Citation.] An appeal lies from such an interlocutory judgment." (Fn. omitted.)

■ Thus, where a trial is bifurcated, the resolution *in favor of the plaintiff* of either the existence of special defenses (Code Civ. Proc., § 597) or the issue of liability (Code Civ. Proc., § 598; *Horton v. Jones,* 26 Cal.App.3d 952 [103 Cal.Rptr. 399]) is not a final judgment, and therefore may not be the subject of an appeal until all other issues have been decided. (See *Crofoot* v. *Crofoot,* 132 Cal.App.2d 794 [283 P.2d 283].) A contrary conclusion would defeat the purposes for bifurcation and the final judgment rule. (See generally, Note, *Use of the Bifurcated Trial to Avoid Collateral Estoppel and the Expanding Concept of Final Judgment* (1975) 7 Sw. U. L.Rev. 161.)

■ Under section 11580.2, subdivision (f), of the Insurance Code, however, the following provision is made: "(f) The policy or an endorsement added thereto shall provide that the determination as to whether the insured shall be legally entitled to recover damages, and if so entitled, the amount thereof, shall be made by agreement between the insured and the insurer, or, in the event of disagreement, by arbitration. . . ."

The subdivision also enables the parties to utilize the deposition and discovery provisions of the Code of Civil Procedure (§ 2016 et seq.), the superior court to have jurisdiction over those matters. (Ins. Code, § 11580.2, subd. (f)(1).) We note that in the instant case, although the questions of liability and damages could have both been resolved by arbitration (Ins. Code, § 11580.2, subd. (f)), the moving party (Lara) chose to proceed first in superior court under the provisions of Code of Civil Procedure section 597.

In *Felner* v. *Meritplan Ins. Co.,* 6 Cal.App.3d 540 [86 Cal.Rptr. 178], which involved the uninsured motorist coverage of a liability insurance policy, the court concluded that, where an issue was properly before the arbitrator for decision, "the only questions for the superior court to consider in confirming or vacating the arbitration award were whether

there had been corruption or misconduct by the arbitrator and whether the arbitrator had improperly conducted the hearing or exceeded his powers in making his award." (*Id.,* at p. 544.) The court in *Felner,* after referring to the provisions of section 11580.2, subdivision (f), found that the matter had been submitted to arbitration under the terms of the insurance policy. In the instant case, not only is arbitration required under the language of subdivision (f), but it is also a part of the trial court's order. Specifically, the trial court determined that Farmers was liable to Lara and that the issue of damages was to be resolved by agreement between the parties, "or, in the event of disagreement, by arbitration." This language is merely a restatement of that found in subdivision (f).

The question now before us is: When the liability phase of a bifurcated trial is heard by a trial court but the damage phase is to be heard by an arbitrator, is the liability determination deemed excepted to in the same manner as if the entire matter had been resolved by a single tribunal, or, is there no exception and is judgment final as to liability? Due to the nature of this case and the unique circumstances under which it was instituted, we find that the trial court's order in favor of Lara was appealable and that the issue of Farmers' liability may be resolved prior to the arbitration phase of the proceedings.

Therefore, we consider the merits of this case:

Under subdivision (a) of Insurance Code section 11580.2, it is required that every policy of "bodily injury liability insurance" contain a provision "insuring the insured, his heirs or his legal representative for all sums within [certain] limits which he or they . . . shall be legally entitled to recover as damages for bodily injury or wrongful death from the owner or operator of an uninsured motor vehicle." Subdivision (b) of section 11580.2 defines "insured" as "the named insured and the spouse of the named insured and relatives of either while residents of the same household while occupants of a motor vehicle or otherwise, heirs and any other person while in or upon or entering into or alighting from an insured motor vehicle and any person with respect to damages he is entitled to recover for care or loss of services because of bodily injury to which the policy provisions or endorsement apply." ■ These provisions of section 11580.2 are to be read into every insurance policy to which the section applies (*Dufresne* v. *Elite Insurance Co.,* 26 Cal.App.3d 916, 922 [103 Cal.Rptr. 347, 55 A.L.R.3d 206]; *Modglin* v. *State Farm Mut. Automobile Ins. Co.,* 273 Cal.App.2d 693, 698 [78 Cal.Rptr. 355])

and are to be liberally construed to carry out the objective of giving "monetary protection to persons who while lawfully using the highways themselves suffer grave injury through the negligent use of those highways by others." (*Allstate Ins. Co.* v. *Smith,* 9 Cal.App.3d 898, 902 [88 Cal.Rptr. 593]; see also *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.,* 58 Cal.2d 142, 153 [23 Cal.Rptr. 592, 373 P.2d 640].)

■ Farmers' principal contention on appeal is that the trial court erred in finding that Lara was Menchaca's "spouse" and was therefore entitled to recover under Menchaca's policy with Farmers.[5] The trial court in reaching its decision and Lara in responding to Farmer's brief have both relied upon the decision in *In re Marriage of Cary,* 34 Cal.App.3d 345 [109 Cal.Rptr. 862].[6] In *Cary,* the court essentially held that, as a result of the Family Law Act (Civ. Code, §§ 4000-5138),[7] a meretricious spouse has the same property rights as a putative spouse. (*Estate of Atherley,* 44 Cal.App.3d 758, 769 [119 Cal.Rptr. 41].) Therefore, upon separation of two parties who knew they were not married, the court ordered that there be an equal division of the property which would have been community property had the parties been married. To qualify for such a property division, however, there had to be "established not only an ostensible marital relationship but also an actual family relationship, with cohabitation and mutual recognition and assumption of the usual rights, duties, and obligations attending marriage." (*Id.,* at p. 353.) Although the *Cary* rationale has subsequently been followed (*Estate of Atherley, supra,* 44 Cal.App.3d 758, 769), the case has also been criticized, and earlier decisions disallowing property rights for a meretricious spouse (*Keene* v. *Keene,* 57 Cal.2d 657 [21 Cal.Rptr. 593, 371 P.2d 329]; *Vallera* v. *Vallera,* 21 Cal.2d 681 [134 P.2d 761]) have been followed (*Powell* v. *Rogers* (9th Cir. 1974) 496 F.2d 1248,

---

[5]Since all of Menchaca's claims against Farmers were satisfied and the only issues raised at the trial level and in the parties' briefs concern the definitional portion of section 11580.2, we assume that if Lara is an "insured" under that section, she will be entitled to recover for injuries suffered while she was a pedestrian in the crosswalk.

[6]We find, as the trial court inferentially did by relying on *Cary,* that Lara was not a "putative" spouse; the testimony of Lara and Menchaca indicated that they both knew that no marriage ceremony had been performed and that they were "common-laws."

[7]We do recognize that the decision in *Cary* had not been filed at the time of the accident (Jan. 7, 1973) or at the time of the filing of the complaint (June 1, 1973); however, the decision had been rendered by the time of the trial (Apr. 19, 1975). Additionally, the opinion in *Cary* merely involved the construction of statutes which were in effect at the time of the accident. (See Civ. Code, §§ 4000-5138 (operative, Jan. 1, 1970).)

1250-1251, cert. den., 419 U.S. 1032 [42 L.Ed.2d 307, 95 S.Ct. 514]; *Beckman* v. *Mayhew*, 49 Cal.App.3d 529, 534-535 [122 Cal.Rptr. 604]).[8]

In the present case, we are not concerned with the property rights of a meretricious couple, but rather with the rights of one party to the relationship under an insurance policy issued to the other party. We find that the rights under an insurance policy and the rights in jointly acquired property are sufficiently distinguishable to preclude our consideration and application of *Cary*. In *Cary*, the court was confronted with two parties who, although aware of the absence of a legal marriage, had conducted themselves as a married couple and had acquired property during the course of their relationship. The court's decision to require an equal division of that property stemmed in part from its recognition, as reflected in the following statement, that any other disposition would have been inequitable. " . . . We should be obliged to presume a legislative intent that a person, who by deceit leads another to believe a valid marriage exists between them, shall be legally guaranteed half of the property they acquire even though most, or all, may have resulted from the earnings of the blameless partner. At the same time we must infer an inconsistent legislative intent that two persons who, candidly with each other, enter upon an unmarried family relationship, shall be denied any judicial aid whatever in the assertion of otherwise valid property rights." (*In re Marriage of Cary, supra,* 34 Cal.App.3d 345, 352.)

No similar equitable considerations are involved in the instant case for primarily two reasons. To begin with, there has been no separation between the two partners; even if Lara were a "putative" spouse, she would only be able to assert her rights in the "quasi-marital" property upon the dissolution of the "marriage" or upon the death of Menchaca. (7 Witkin, Summary of Cal. Law, Community Property, §§ 115, 118-119, pp. 5207-5208, 5212-5213.) Secondly, and perhaps more critically, we are not dealing with the division of jointly acquired property between two equally guilty parties, but rather with the rights of one meretricious spouse against a third party with whom the other spouse has dealt at arm's length. Certainly that third party, here Farmers, is entitled to rely upon the usual meaning to be given the words that they have used in their standard form insurance policies. In this respect, the word "spouse," as used in insurance statutes and insurance policies, has been

---

[8]*Marvin* v. *Marvin* (L.A. Super. Ct. No. C-233031, a recent case involving this question of property rights, is currently pending before the California Supreme Court. (Hg. granted Sept. 17, 1975.)

defined as follows: "A spouse is a legal wife or husband." (*United States v. Robinson* (5th Cir. 1930) 40 F.2d 14, 16.) "An existing legal marriage, arising from lawful wedlock, is an essential element of the status of being a 'spouse' according to the legal as well as the usual and ordinary meaning of the word. A spouse is a lawful wife or husband." (*Harleysville Mutual Casualty Ins. Co. v. Carroll,* 50 Del. 67 [123 A.2d 128, 131]; see also *Lopez v. Santiago,* 125 N.J.Super. 268 [310 A.2d 500]; *United States Fire Insurance Company v. Cruz,* 35 Misc.2d 272 [230 N.Y.S.2d 779].)

In California, the common law marriage is not recognized, and certain conditions, including a formal ceremony, must be met before the marriage is considered "lawful." (Civ. Code, §§ 4100-4309.) Despite the policy of liberal construction of section 11580.2, this policy does not require that we distort the ordinary meaning of the language used in the statute. Since the statute is obviously designed to cover those individuals who would be likely to use the insured motor vehicle, the term "spouse" was used no doubt to insure the permanency of the relationship which would also obtain if one were the named insured's "relative." Under these circumstances, we find that Lara was not the "spouse" of Menchaca within the meaning of section 11580.2 or the Farmers insurance policy.

■ Lara argues that even if she were not Menchaca's "spouse," she would be covered under the statute and the policy as a "person while in or upon or entering into or alighting from an insured motor vehicle." (Ins. Code, § 11580.2, subd. (b).) With this contention we cannot agree. In *Cocking v. State Farm Mut. Automobile Ins. Co.,* 6 Cal.App.3d 965 [86 Cal.Rptr. 193], the court reviewed the authorities construing the above language, primarily focusing on the word "upon." The court concluded: " . . . Such language has been interpreted to mean that coverage is extended to the person seeking recovery under the policy where he was using the vehicle, either as the named insured or with the latter's permission or consent, express or implied, and where he was in such a position in relation thereto as to be injured in its use. [Citations.] In determining whether the person was in such a position in relation to the vehicle as to be injured in its use, consideration must be given, not only to what the person was doing upon injury, but also to his purpose and intent. [Citations.]" (*Id.,* at pp. 969-970.)

In holding that the plaintiff was within the coverage of the statute and the policy, the court observed that, at the time of injury, the "plaintiff

[had been] performing an act physically and directly related to the car." (*Id.,* at p. 971.) The plaintiff had specifically been placing chains on the tires of the car, as required by highway conditions existing at the time.

We find that the principles enunciated in *Cocking* are equally applicable to the definition of "entering into." Thus, although in the present case Lara testified that she intended to proceed directly to her car from the movie theater, her injuries did not result from her being in close proximity to the car or from her performance of acts "physically and directly related to the car" or its use. (*Id.*; see also *State Farm Mut. Auto. Ins. Co.* v. *Spann,* 31 Cal.App.3d 97 [106 Cal.Rptr. 923]; *Utah Home Fire Ins. Co.* v. *Fireman's Fund Ins. Co.,* 14 Cal.App.3d 50 [91 Cal.Rptr. 781].) We therefore find that Lara was not a "person [injured] while in or entering into or alighting from an insured motor vehicle." (Ins. Code, § 11580.2, subd. (b).)

■ Finally, Lara claims that she is "covered under the policy as a person with respect to damages the named insured is entitled to recover for care or loss of services because of bodily injury." (See Ins. Code, § 11580.2, subd. (b).) This contention is without merit. To begin with, the instant action was not instituted by the "named insured," Menchaca, to recover for the loss of Lara's services, but rather, by Lara, to determine her *right* to compensation under the insurance policy.[9] Even if this were not the case, Menchaca could not recover for the loss of Lara's services, since she was never paid for them, nor was she in Menchaca's employ.

The judgment is reversed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied July 6, 1976, and the petition of respondent Lara for a hearing by the Supreme Court was denied August 12, 1976.

---

[9]Only the complaint covering both Menchaca's and Lara's causes of action included the allegation that Lara was "a person with respect to damages whom ERASTO MENCHACA is entitled to recover for loss of services because of bodily injury."