[No. B005226. Second Dist., Div. Three. Aug. 27, 1986.]

Estate of CHARLES J. HAFNER, Deceased.
HELEN L. HAFNER, Petitioner and Respondent, v.
JOAN HAFNER et al., Objectors and Appellants;
KIMBERLY HAFNER, Claimant and Appellant.

1372

## COUNSEL

Douglas C. Miller, Fine, Perzik & Friedman and Steinberg, Miller, Bogan & Goldstein for Objectors and Appellants.

Lloyd A. Bulloch for Petitioner and Respondent and for Claimant and Appellant.

## OPINION

**DANIELSON, J.**—The principle issue presented by this case is: as between the surviving, innocent, wife and children of a bigamous husband, and his surviving, innocent, putative spouse[1] and their child, who is entitled to

---

[1] We use the term "wife" as meaning the decedent's wife whose marriage to decedent had never been dissolved, and the term "putative spouse" as it is defined in section 4452 of the Civil Code.

succeed to the husband's intestate estate when that estate is, as to his surviving wife and children, the husband's *separate property* and is, as to the putative spouse, quasi-marital property?

We hold that, as separate property, one-half of the estate goes to the surviving wife and four children of the decedent for distribution pursuant to former section 221 of the Probate Code (hereafter section 221) and the other one-half goes to the surviving putative spouse as quasi-marital property pursuant to Civil Code section 4452 and former section 201 of the Probate Code (hereafter section 201).[2]

## FACTUAL BACKGROUND AND PROCEEDINGS BELOW[3]

Joan Hafner (Joan) and the decedent Charles J. Hafner (Charles) were married on June 12, 1954, in the State of New York; it was the first marriage for each of them. Following their marriage they took up residence in College Point, New York. Joan has continued to live in or near College Point ever since. The marriage between Joan and Charles produced three daughters, all of whom are now living: Catherine Kotsay, born December 25, 1955; Lillian Mayorga, born November 18, 1956; and Dorothy Hafner, born November 16, 1957.[4]

In February or March of 1956 Joan learned that she was pregnant with her second child and told Charles. In April or May of 1956 Charles left Joan, without prior notice and without letting her know where he would be. At that time their first child, Catherine, was sick and Joan moved back to her parents, who supported her; she received no support from Charles.

Joan and Charles were reunited briefly in early 1957. Charles left Joan for the last time in February 1957. Joan, then pregnant with their third child, encountered Charles on the street in New York in May 1957. He told

---

[2]Hereafter all sectional references are to the Probate Code unless otherwise specified. The Probate Code was extensively amended and rewritten in 1983, effective January 1, 1985. This case is governed by the Probate Code in effect before January 1, 1985. (Prob. Code, § 6103.)

[3]The factual background is drawn from the trial court's statement of decision, or otherwise from the record on appeal as augmented. These facts are not controverted and not in dispute.

Pursuant to appellant's request under Evidence Code section 459, we have taken judicial notice of the documents listed in appendix A to appellant's opening brief which are contained in the following Los Angeles Superior Court files: Hafner v. Melton, case No. NWC 35763 (personal injury); Conservatorship of Charles J. Hafner, Conservatee, case No. NCP 5121B (conservatorship); and Estate of Charles J. Hafner, Deceased, case No. SEP 13891 (probate).

[4]Decedent's three children by his marriage to Joan are also appellants in this appeal. While we refer to Joan Hafner as Joan in this opinion, we shall also refer to Joan Hafner and her three children by decedent collectively as appellants.

her, "I hear you are going to have another baby," and asked her whether she would like to go to California. Joan replied, "What guarantees would I have that you won't leave me pregnant again?" Charles replied, "There's no guarantees."

In 1956 and 1958, Joan filed support proceedings against Charles in the New York family court. In 1956, she obtained a $12 per week child support order and in 1958 she obtained a similar order for $20 per week. Charles made four support payments in 1958 but never made any other payments. In 1958, Joan consulted an attorney in New York on the support matters, but, because of the expense required to locate Charles in California, she did not pursue the matter. In 1961, Joan abandoned any further efforts to obtain support warrants in the New York family court because such efforts caused her to lose time on her job.

Joan last saw Charles in the New York family court in 1958 when he was brought before the court on a support warrant. Shortly after that appearance, an acquaintance told Joan that Charles had gone to California. From 1958 until his death in 1982, Joan and Charles never saw or communicated with each other again. Joan knew that Charles was in California but did not know where in California.

Beginning in 1961, and continuously thereafter, Joan considered her marriage to Charles for all practicable purposes to have ended and that they would never reconcile or even see each other again.

Except for short intervals to have their babies, Joan was employed at all times following her marriage to Charles, and was so employed at the time of the trial below. She reared the three daughters of herself and decedent.

In August, 1953, shortly after graduating from high school, Joan commenced working at a magazine company and continued until August, 1955, when she left because she was pregnant with her first daughter. In April, 1957, she went to work on the assembly line of a rubber company, on a machine putting snaps on baby pants. Except for a three-month lay-off to have her third baby she stayed on that machine for about twelve years, when the company moved away. She started at the minimum wage and later became a piece worker. After two weeks of unemployment she went to work for a glove manufacturing company, starting as an order picker, filling orders, and later as a stock supervisor, making sure that the orders were picked and sent out. She was still so employed at the time of the trial of the within action and had then been working at the glove factory for 14½ years.

Joan never sought a divorce from Charles; it is unclear whether she did not seek a divorce because of religious convictions, the lack of financial resources, or a lack of interest. At no time from their marriage in 1954 until his death on December 25, 1982, did Charles ever file proceedings to dissolve his marriage to Joan. Their marriage was still in full force and effect at the time of Charles' death.

Respondent Helen L. Hafner (Helen) met Charles in 1962 when he was a patron at a beer bar where she was working as a barmaid. Helen had separated from her second husband, Eldon Pomeroy, in November, 1961.

Charles told Helen that he had divorced his wife, Joan, in New York on charges of adultery, that he had three children of that marriage with Joan, and that he had given up an interest in a house in lieu of child support. Charles further stated that the divorce records had been destroyed in a fire in New York. Helen, in good faith, relied on these representations and believed them to be true continuously thereafter; she had no actual knowledge or reasonable grounds to believe otherwise.

In July 1962, Helen and Charles went to Tijuana, Mexico, to enable Helen to obtain a divorce from Pomeroy and to participate in a marriage ceremony with Charles. Both of those objectives were accomplished. Helen, in good faith, believed that both the divorce and marriage were valid. Following their return from Tijuana in 1962, Helen and Charles lived as husband and wife.

Helen's second husband, Pomeroy, was killed in an accident on June 21, 1963. In June 1963, Helen consulted an attorney and was advised that her Mexican divorce from Pomeroy was invalid in California. Following Pomeroy's death Helen and Charles went to Las Vegas, Nevada, and participated in a marriage ceremony. After that marriage ceremony, on October 14, 1963, Helen and Charles returned to the Los Angeles area where they lived and held themselves out as husband and wife until Charles' death. They had one child, Kimberly Hafner, born December 10, 1964.[5]

On September 27, 1973, Charles was seriously injured in an automobile accident which left him with permanent physical disabilities and brain damage that rendered him incapable of employment.[6] During the nine months in the hospital and his subsequent recovery period, Helen faithfully attended

---

[5]Kimberly Hafner filed a "protective" cross-appeal to protect her rights in the event of a reversal or modification of the judgment on appeal.

[6]The trial court found that Charles' condition in 1974 was such that he could have communicated with Joan and their children had he desired to do so. Charles and Helen also visited his sister and attended his brother's wedding in San Jose in 1975.

to his needs as his wife and continued to do so for some nine years until his death.

Charles and Helen accumulated approximately $69,000 in hospital and doctor bills as a result of the accident. Those bills were not paid until Charles's personal injury action was settled for $900,000, in 1975, which netted decedent $600,000 after attorney's fees. Helen and her attorney, Charles Weldon, were appointed as Charles's co-conservators in 1975. The personal injury settlement was placed in conservatorship accounts and administered under court supervision. The conservatorship assets were subsequently transferred to Charles' probate administrator following Charles's death.

Charles Hafner died intestate on December 25, 1982, leaving an estate appraised at $416,472.40; his entire probate estate consists of the remainder of the proceeds of his personal injury settlement.

Joan apparently learned of Charles's personal injury in 1974; she was not able financially to visit him following his accident. Joan learned of Charles's death a few days after Christmas, 1982; she did not attend his funeral and did not know where it was.[7]

Petitions for letters of administration were filed by Helen and by Joan on January 21 and February 14, 1983, respectively. By stipulation the competing petitions were taken off calendar and a bank was appointed administrator. The bank administrator is not a party to this appeal.

Helen filed a petition for determination of entitlement to estate (former § 1080), claiming to be the surviving wife of Charles and seeking to have the probate court determine the persons entitled to share in the distribution of Charles's estate.

Appellants (Joan and the three daughters) filed a response to the petition and a statement of interest, asserting their respective claims to a share of Charles' estate, as his surviving spouse and children, pursuant to section 221.[8] Kimberly Hafner, a child of Charles, also filed a statement of interest in the estate.

---

[7]The cause of Charles' death was acute myocardial infarction caused by coronary artery athersclerosis, which was not related to the injuries sustained by him in the accident.

[8]Former section 221 of the Probate Code set forth the rights of a surviving spouse and children to succeed to shares of the separate property of a decedent who died intestate. That section was repealed by Statutes of 1983, chapter 842, section 22, page 3034, operative January 1, 1985. The former section applied to estates of decedents dying before January 1, 1985, and applies to Charles' estate in the case at bench.

Appellants claimed that they, together with Kimberly, should succeed to Charles' entire estate under section 221, and that even if Helen were found to be a good faith putative spouse the court should, under equitable principles, divide the estate among them.

Pursuant to stipulations without prejudice by Joan and Helen, acting through their attorneys and filed in the cause, Helen was awarded a family allowance of $1,800 per month from and after the date of Charles's death. Later, and commencing November 1, 1983, a family allowance of $1,800 per month was ordered payable to Helen and a family allowance of $400 per month was ordered payable to Joan, both until trial of the petition for determination of heirship. Such stipulations were expressly without prejudice to either Joan or Helen in their respective positions in the controversy and with the provision that all such allowances should be charged in full against such person's distributive share of the estate, and would not otherwise be reimbursed.

Helen's petition came on for a nonjury trial on January 12, 1984. Following the conclusion of the trial, the court rendered its statement of decision, on February 1, 1984, in which it concluded that Helen had a legal right to succeed to Charles's entire estate as his surviving spouse under Probate Code section 201. The court also concluded that Helen was Charles' good faith putative spouse and that it would be inequitable to deny her Charles' entire estate.

On February 27, 1984, the court made and entered its judgment determining entitlement to estate distribution and order for family allowance, in accordance with its statement of decision. Appellants and Kimberly Hafner filed timely notices of appeal from that judgment.

### CONTENTIONS

Appellants contend that (1) the trial court erred in awarding the entire estate to the putative spouse, Helen, in the absence of an estoppel against the wife, Joan, and Charles' children; (2) the trial court improperly applied equities so as to disinherit the wife and children of the decedent in favor of his putative spouse; and (3) the trial court's decision as to the family allowance was erroneous as a matter of law, and was not supported by the evidence.

### DISCUSSION

*The Findings*

The trial court's statement of decision set forth certain findings upon which its decision and the judgment were based. Among these findings are:

1. Joan and Charles were legally married on June 12, 1954; neither Joan nor Charles ever obtained divorce, annulment, or other dissolution of their marriage; Joan never knew of Charles' marriage to Helen until his death; and three daughters were born of their marriage.

2. Helen and Charles participated in a marriage ceremony in Tijuana, Mexico, in 1962, and another marriage ceremony in Las Vegas, Nevada, on October 14, 1963; at all times to and including Charles' death Helen believed in good faith that her marriage with Charles was valid and that Charles had previously obtained a valid divorce from his wife; at all times on and after October 14, 1963, Helen was a good faith putative spouse of Charles; the marriage of Helen and Charles was invalid [void] in that the prior marriage of Joan and Charles was an existing marriage; Charles and Helen had one child.

3. The entire estate of Charles consists of the remainder of the proceeds of Charles' personal injury settlement.

4. Joan is not estopped by any act or omission on *her* part to assert the invalidity of the [void] marriage of Charles and Helen. (Italics in statement of decision.)

5. Joan, by reason of privity with Charles, would be estopped to challenge the validity of Charles's marriage to Helen because of Charles's misrepresentation to Helen regarding his divorce from Joan. The three daughters of Joan and Charles, Catherine, Lillian, and Dorothy would be estopped for the same reason.

*The Status of the Parties*

Joan Hafner was, at all times from June 12, 1954, until the death of Charles, the wife (spouse) of the decedent, Charles Hafner. The trial court properly found that Joan and Charles were married, each for the first time, on June 12, 1954, and that neither had ever taken any steps to dissolve their marriage.[9]

Charles Hafner was, at all times from June 12, 1954, until his death, the husband (spouse) of Joan Hafner. We note that Charles was not the putative spouse of Helen. That status belongs only to the party or parties to a void marriage who the trial court finds to have believed in good faith in the validity of the void marriage. (Civ. Code, § 4452.) The trial court did not so find in this case.

Helen was the putative spouse (Civ. Code, § 4452) of Charles from October 14, 1963, until his death.

---

[9]Civil Code section 4350 provides: "Marriage is dissolved only by (1) the death of one of the parties, (2) the judgment of a court of competent jurisdiction decreeing a dissolution of the marriage, or (3) a judgment of nullity."

Catherine Kotsay, Lillian Mayorga and Dorothy Hafner, the three daughters of Joan and Charles, and Kimberly Hafner, the daughter of Helen and Charles, were all children of decedent Charles Hafner.[10]

*The Character of the Property*

We must view the character of the property in Charles's intestate estate from the perspectives of the surviving wife and the surviving putative spouse.

(a) *From the Perspective of Joan*

■ As to Joan, the entire probate estate was the separate property of Charles, the decedent.

Charles was a married person, married to Joan, and was living separate from her at the time the money was received by him in 1975, pursuant to the settlement of his claim for damages for personal injury.

At the time Charles's personal injury settlement money was received, in 1975, Civil Code section 5126 provided, in pertinent part: "(a) All money . . . received by a married person . . . for damages for personal injuries . . . pursuant to an agreement for the settlement or compromise of a claim for such damages is the separate property of the injured person if such money . . . is received . . .: [¶] . . . (2) While either spouse, if he or she is the injured person, is living separate from the other spouse."

Civil Code section 5126 is consonant with Civil Code section 5118 which provides, in pertinent part: "The earnings and accumulations of a spouse . . . while separate and apart from the other spouse, are the separate property of the spouse."

(b) *From the Perspective of Helen*

■ As to Helen, the entire probate estate is quasi-marital property.

The trial court found that Helen was the putative spouse of Charles. At the time of the events of this case, former section 4452 of the Civil Code,[11]

---

[10]Civil Code section 7002 provides: "The parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents."

[11]Civil Code section 4452 was amended by Statutes 1984, chapter 1671, section 2, effective January 1, 1985, to provide that the quasi-marital property of an annulled marriage is liable for debts of the parties. The 1984 amendment would have no effect upon the resolution of the issues presented by this case.

a part of The Family Law Act enacted in 1969, provided, in pertinent part: "Whenever a determination is made that a marriage is void or voidable and the court finds that either party or both parties believed in good faith that the marriage was valid, the court shall declare such party or parties to have the status of a putative spouse, and, if the division of property is in issue, shall divide, in accordance with Section 4800, that property acquired during the union which would have been community property or quasi-community property if the union had not been void or voidable. Such property shall be termed 'quasi-marital property.'"[12]

*Principles Applicable to Intestate Succession to Quasi-Marital Property of a Void Marriage*

 It is settled that in the case of a void or voidable marriage, as between a putative spouse and the other spouse, or as between the surviving putative spouse and the heirs of his or her decedent other than the decedent's surviving legal spouse, the putative spouse is entitled to share in the property accumulated by the partners during their void or voidable marriage. It is also settled that the share to which the putative spouse is entitled is the same share of the quasi-marital property as the spouse would receive as an actual and legal spouse if there had been a valid marriage, i.e., it shall be divided equally between the parties. (*Estate of Leslie, supra*, 37 Cal.3d 186, 194 [207 Cal.Rptr. 561, 689 P.2d 133]; Civ. Code, §§ 4452, 4800, subd. (a).)

 The proportionate contribution of each of the parties to the property acquired during the void or voidable union is immaterial in this state because it is divided as community property would be divided upon the dissolution of a valid marriage. (*Vallera* v. *Vallera* (1943) 21 Cal.2d 681, 683-684 [134 P.2d 761].)

 These principles were established by numerous judicial decisions, and were made a part of our positive law by the enactment, in 1969, of Civil Code section 4452, a part of the Family Law Act, effective January 1, 1970. There is no reason to believe that the Legislature, by that enactment, intended to change those principles. (Cf. *Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 681 [134 Cal.Rptr. 815, 557 P.2d 106].)

---

[12]There can be no community property in the absence of a valid marriage. (Civ. Code, § 687; *Estate of Leslie* (1984) 37 Cal.3d 186, 193 [207 Cal.Rptr. 561, 689 P.2d 133].) The putative marriage cases decided prior to the enactment of the Family Law Act have struggled with the term to be applied to property which cannot be "community property" since there is no valid marriage but which, otherwise, has all of the incidents of community property. In Civil Code section 4452, our Legislature has resolved this problem by directing that such property be termed "quasi-marital property." It is with considerable relief that we use that term here.

*The Trial Court Erred in Awarding the Entire Intestate Estate to the Putative Spouse*

We have examined the cases cited by the trial court as authorities for its decision and find them wanting. None of the cited cases is authority for a decision on the facts and issues which were before the trial court in the case at bench.

The language used in an opinion is to be understood in the light of the facts and the issues then before the court, and cases are not authority for propositions not considered therein and actually adjudicated. (Code Civ. Proc., § 1911; *People* v. *Ceballos* (1974) 12 Cal.3d 470, 484 [116 Cal.Rptr. 233, 526 P.2d 241]; *McDowell & Craig* v. *City of Santa Fe Springs* (1960) 54 Cal.2d 33, 38 [4 Cal.Rptr. 176, 351 P.2d 344]; *Coats* v. *Coats* (1911) 160 Cal. 671, 679 [118 P. 441]; *Karlin* v. *Zalta* (1984) 154 Cal.App.3d 953, 976 [201 Cal.Rptr. 379]; and see authorities collected at 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 783, pp. 753-755.)

 The principle issue before the court in this case is, as between the surviving wife and children of the decedent, on the one hand, and the decedent's good faith putative spouse under his bigamous marriage, on the other, who is entitled to succeed to his intestate estate?

The trial court found and concluded that under the circumstances of this case, Helen had a legal right to succeed to the entire estate under Probate Code section 201 as a surviving spouse. In support of that conclusion, the court cited *Estate of Krone* (1948) 83 Cal.App.2d 766 at page 770 [189 P.2d 741], *Estate of Foy* (1952) 109 Cal.App.2d 329 [240 P.2d 685], *Speedling* v. *Hobby* (D.C. Cal. 1955) 132 F.Supp. 833, and *Kunakoff* v. *Woods* (1958) 166 Cal.App.2d 59, 67 [332 P.2d 773]; and then sought to buttress its decision by also citing *Union Bank & Trust Co.* v. *Gordon* (1953) 116 Cal.App.2d 681, 689 [254 P.2d 644]; *Estate of McAfee* (1960) 182 Cal.App.2d 553, 556-557 [6 Cal.Rptr. 79]; *Estate of Long* (1961) 198 Cal.App.2d 732, 738 [18 Cal.Rptr. 105]; *Estate of Goldberg* (1962) 203 Cal.App.2d 402 [21 Cal.Rptr. 626].

With one exception, none of the cases relied upon by the trial court presented a fact situation similar to the facts of the case at bench, and the facts of that one exception (*Union Bank & Trust Co.* v. *Gordon, supra*) are so clearly and fairly distinguishable from the facts of this case that it is not precedent or authority supporting the trial court's decision.

*Union Bank & Trust Co.* v. *Gordon, supra,* 116 Cal.App.2d 681, was in fact a contest between Sara, the first wife of Leo, the decedent, and

Elsie, Leo's putative wife. The bank was special administrator of Leo's estate which consisted entirely of property which Leo and Elsie had accumulated during their 21-year putative marriage and was in the nature of community property. Sara and Leo had married in New York in 1921, and Sara obtained a decree of separate maintenance in 1927. In 1928 Leo moved to California, and in 1929 he sued Sara for divorce in Nevada and obtained a decree of divorce; Sara was served in that action. In 1929, Leo married Elsie and lived with her as husband and wife until he died in 1950. In 1936, Sara married Milton, and in 1949 she obtained an annulment of that 13-year marriage on the ground of fraud. In an action to quiet title to the property in Leo's estate, the court held that Sara was estopped "by every principle of law and equity from attacking the Nevada decree or asserting its invalidity" (*id.*, at p. 689) because she had acquiesced in and relied upon it when she married Milton. The court also found that Leo and Elsie had a good faith putative marriage, and that the property was acquired during that union. Leo had disposed of his interest in it by will.

In its decision in the case at bench, the trial court relied principally upon *Estate of Krone, supra,* 83 Cal.App.2d 766.

In *Estate of Krone, supra,* 83 Cal.App.2d 766, three adult children of decedent by a previous marriage filed a claim of interest in their father's estate declaring that the property of the estate was the separate property of the decedent in that his surviving wife was not his lawful wife because at the time of their marriage her divorce from her former husband had not become final, though a final decree was entered 10 months later. The surviving wife also filed a statement of claim of interest alleging that she and decedent had been married in April 1934, and lived together as husband and wife until his death in 1946, and alleging other facts which were set forth in the findings of the trial court.

"The court found that [decedent and his wife had] lived and cohabited as man and wife from the date of their attempted marriage until decedent's death; that at the time of such marriage neither had any property; that as a result of their joint efforts the parties accumulated personal property of the value of $16,412.51; that at the time of her marriage appellant believed in good faith and that she was the lawfully wedded wife of decedent, due to her ignorance of the law which required the lapse of one year after the entry of an interlocutory decree; that she had obtained an interlocutory decree from her former husband February 13, 1934, and that the final judgment therein was not entered until February 19, 1935, or 10 months after her purported marriage to decedent; that she had no information of any claim of illegality of her marriage to decedent until the filing by respondents of their claim to an interest in the estate; . . ." (*Id.*, at p. 767.)

On appeal, the reviewing court implicitly found that the decedent and his surviving wife were partners to a putative marriage. The court stated that "[t]he term ['putative marriage'] is applied to a matrimonial union which has been solemnized in due form and celebrated in good faith by both parties but which by reason of some legal infirmity is either void or voidable. The essential basis of such marriage is the belief that the marriage is valid. (*Vallera* v. *Vallera* (1943) 21 Cal.2d 681, 684.)" (*Estate of Krone, supra,* 83 Cal.App.2d at p. 768.) The court then reviewed several cases dealing with the division of property acquired due to the joint efforts of the partners during a void or voidable marriage entered into in good faith, and concluded "that upon the dissolution of a putative marriage by decree of annulment or by death the [surviving spouse] is to take the same share to which [he or she] would have been entitled as a legal spouse." (*Id.,* at p. 769.)

In *Estate of Foy, supra,* 109 Cal.App.2d 329, the contesting parties were the putative spouse (wife) of the decedent and the decedent's son by a prior marriage. Decedent's marriage to his putative wife had been celebrated in the interlocutory period following his divorce from his prior wife. Decedent died intestate; his estate consisted entirely of property in the nature of community property. The court held that the putative wife/widow was entitled to take the entire estate under former Probate Code section 201. (*Id.,* at pp. 331-332.)

*Speedling* v. *Hobby, supra,* 132 F.Supp. 833, was a controversy between a surviving putative spouse (wife) and the Secretary of Health, Education and Welfare as to whether the putative wife/widow had the same status in taking intestate property as a widow would have and would therefore be eligible to receive "mother's insurance benefits" under the social security act. Citing *Krone, supra,* 83 Cal.App.2d 766, the United States District Court held that a putative spouse was entitled to succeed to "community property" in California and therefore entitled to the social security benefit. The putative spouse and decedent had married during the interlocutory period following a divorce, and had lived together for 18 years until decedent's death.

*Kunakoff* v. *Woods, supra,* 116 Cal.App.2d 59, was an action for wrongful death and the question was whether a putative spouse (wife) was an "heir" within the meaning of the statutory wrongful death law. (Code Civ. Proc., § 377.) Citing *Krone, supra,* the court held that, in the case of intestacy, the putative spouse could succeed to her "husband's" estate under former Probate Code section 201, and that, therefore, she was an "heir" and as such was entitled to bring an action for wrongful death under Code of Civil Procedure section 377.

*Estate of McAfee, supra,* 182 Cal.App.2d 553, is not authority for anything relating to this case. *McAfee* was an appeal from an order appointing an administrator of an estate. The reviewing court reversed the order, pointing out that the trial court had failed to make findings, or had made conflicting findings, on material issues. The court mentioned *Estate of Krone, supra,* 83 Cal.App.2d 766, in commenting that the trial court would have to find whether the decedent was legally married and, if not, whether there was a putative marriage. (*Id.,* at pp. 556-557.)

*Estate of Long, supra,* 198 Cal.App.2d 732, was an appeal from an order decreeing final distribution of an estate. It presented a contest between the half-siblings of the decedent and the decedent's surviving wife, Emma. The half-siblings questioned whether Emma was legally divorced from her former husband at the time of her marriage to decedent. Ruling that the presumption of validity of the second marriage had not been overcome, the court held that Emma and decedent were validly married, that except for a few items their property had been acquired through their joint efforts, and that all of the property should be distributed to Emma except for decedent's separate property and that one-half of the separate property be distributed to her. In dictum, the court cited *Krone, supra,* and stated that if there had been a putative marriage between Emma and decedent, *Krone* would have applied. (*Id.,* at p. 738.) The Court of Appeal affirmed.

*Estate of Goldberg, supra,* 203 Cal.App.2d 402, was a contest between Edith, the second wife of Sam, and three of Sam's children by his first marriage, for succession to Sam's intestate estate. The reviewing court affirmed the trial court's ruling that Edith was Sam's good-faith putative spouse and, citing *Krone, supra,* ruled that Edith was entitled to the same share of the "community property" as she would have received had she been his actual wife.

In sum, except for *Union Bank & Trust Co.* v. *Gordon, supra,* 116 Cal.2d 681, which is clearly distinguishable from this case because of its facts compelling an estoppel, none of the cases relied upon by the trial court present the facts and issues with which we are concerned, i.e., the competing interests of a legal wife and a putative spouse. In *Krone, Foy,* and *Goldberg,* the controversy was between a putative spouse and the decedent's children by a prior marriage. In *Long,* the competing interests were a legal wife and the decedent's half siblings. *Speedling* stands only for the proposition that a putative wife may be eligible for certain social security benefits based upon her decedent "spouse's" earnings, and *Kunakoff* establishes only that a putative spouse can be a plaintiff in a wrongful death action. *McAfee* stands for nothing relevant to the case at bench.

Five additional cases cited by the trial court are of even lesser relevance to the case at bench than the cases reviewed above, and do not require discussion in this opinion. Thus, we find that the cases relied upon by the trial court do not support its decision and the judgment appealed from.

*As Between the Surviving Spouse and Children of a Decedent and the Decedent's Putative Spouse, the Surviving Spouse and Children Are Entitled to Succeed to the Separate Property in an Intestate Decedent's Estate*

We bear in mind that the issue presented in the case at bench is the proper resolution of the competing interests of the legal wife of a decedent, and his putative wife, for succession to his intestate estate.

In *Estate of Leslie, supra,* 37 Cal.3d 186, our Supreme Court, in deciding a contest between the surviving putative spouse of an intestate decedent and the children of that decedent by a prior marriage, observed that "[t]here may be cases in which two or more surviving spouses each claim an intestate share of the decedent's separate property. However, that scenario is not before this court and need not be resolved at this time." (*Id.,* at p. 197, fn. 11.) The case at bench is such a case, and we find substantial public policy and precedent to establish and protect the rights of the legal spouse, and the children of the legal community, in the estate of their spouse and parent.

We first note that marriage and the family are highly favored by the public policy of the State of California, as evidenced by statute and by countless decisions of our courts.

In decisions resolving competing claims of legal spouses of decedents and the decedents' putative spouses, as to the right to succeed to the decedent's estate, our courts have awarded one-half of the quasi-marital property to the putative spouse and the rest of the property to the decedent's legal heirs or as disposed of by decedent's will.

In *Estate of Ricci* (1962) 201 Cal.App.2d 146 [19 Cal.Rptr. 739], the contest was between Viola, the first and legal wife of Henry, and his putative spouse, Antoinetta. At issue was heirship to the property of decedent which had been acquired as the result of the joint efforts of decedent and Antoinetta during the years of their void marriage. Viola and Henry were married in Italy in 1907; that marriage was never terminated and remained in force until Henry's death in 1956. Meanwhile, Henry came to California. Antoinetta, in good faith, participated in a ceremonial marriage with Henry in 1919. Henry and Antoinetta lived together as husband and wife continuously thereafter until Henry died, intestate, in 1956. The trial court found, inter alia, that Antoinetta was the surviving putative wife of

Henry, that the presumption of the validity of the second marriage had been overcome, and that there was no basis in the evidence for an estoppel against Viola. The trial court decreed that one-half of the property should be awarded to Viola and the other half to Antoinetta. The Court of Appeal concluded that the decision of the trial court was supported by the evidence and the law and affirmed the decree.

In its opinion, the reviewing court quoted extensively from Burby, Family Law for California Lawyers, at pages 359-360, setting forth his comments on the problems arising in the distribution of property accumulated in a void or voidable marriage. Professor Burby had written: "'Some difficulty is presented if conflicting claims are asserted by a legally recognized spouse and a putative spouse. Of course the claim of a putative spouse must be limited to property acquired during the continuance of that relationship. It seems obvious that one-half of the property in question belongs to the putative spouse. The other half belongs to the legal community (husband and legally recognized spouse) and should be distributed as any other community property under the same circumstances.

"'A putative marriage was involved in *Estate of Krone*. The property in question was acquired during the continuance of this relationship and was claimed by the putative wife after the death of the husband. Her claim was resisted by issue of a former marriage. The court held that all of the property in question passed to the putative spouse by force of Probate Code section 201, which provides: "Upon the death of either husband or wife, one-half of the community property belongs to the surviving spouse; the other half is subject to the testamentary disposition of the decedent, and in the absence thereof goes to the surviving spouse. . . ." The conclusion reached by the court seems to be a proper one. The claimants (husband's issue by a former marriage) would be entitled to recover only on the theory that the property in question constituted a part of the husband's separate estate. But the property in question was not of that type.

"'A much more difficult problem would be raised if a claim were asserted by a legally recognized spouse. That was the situation involved in *Union Bank & Trust Co.* v. *Gordon* [*supra*] 116 Cal.App.2d 681. The deceased husband devised and bequeathed one-half of the property acquired during the putative marriage to his putative wife, Elsie, and one-half to his children. The legally recognized wife claimed a right to share in his estate. This claim was denied. [The trial court held, inter alia, that the legal wife] was estopped to deny the validity of the putative marriage because after her purported divorce (it was void because secured by the husband in Nevada and without having established a sufficient domicile) she purported to enter into another marriage. In the absence of the argu-

ment that she was estopped to deny the validity of the husband's putative marriage, there is no sound reason for excluding the legally recognized spouse from her share in acquisitions made by her husband during a putative marriage. It is true that one-half of the property belongs to the putative spouse but the other half belongs to the legally recognized community and there is no basis upon which the legally recognized spouse can be excluded from a proper share therein.'" (*Estate of Ricci, supra,* 201 Cal.App.2d at pp. 148-150.)

The *Ricci* court went on to say: "The case of *Union Bank & Trust Co.* v. *Gordon, supra,* in which it was held that the legal wife was not entitled to share in the estate of her deceased husband was correctly decided on the basis of estoppel, but, as we analyze the authorities, the legal wife could not have been excluded without the estoppel. To do so could penalize an innocent wife who had been deserted by her husband, and would be contrary to section 201 of the Probate Code which states that 'Upon the death of either husband or wife, one-half of the community property belongs to the surviving spouse; . . .' Here there are no facts in the record justifying the application of the doctrine of estoppel." (*Id.,* at p. 150.)

"In conclusion we agree with the following statement of the learned trial judge in his memorandum opinion: 'Yet under the case law of this state it seems clear that each of the two widows absent of the other is entitled to the whole estate. Thus, in a contest between them it would seem both logical and equitable to divide the property equally, awarding the putative wife the half to which she [presumably] contributed and giving to the legal but deserted wife the half over which the husband normally has testamentary control.'" (*Id.,* at pp. 151-152.)

*Sousa* v. *Freitas* (1970) 10 Cal.App.3d 660 [89 Cal.Rptr. 485], was a contest between Maria, the legal wife of Manuel, and Catherine, his putative spouse, as to the property of Manuel's estate, all of which had been acquired by the joint efforts of Manuel and Catherine during their void marriage. Maria and Manuel Sousa were married in Portugal in 1905; they had one son. Manuel emigrated to California in 1908, changed his name to Freitas in 1915, and participated in a marriage ceremony with Catherine in 1919. Catherine believed in good faith that she was lawfully married to Manuel and lived with him as wife and husband until Manuel died in 1962. Manuel left a will devising and bequeathing all of his property to Catherine. The trial court awarded the estate one-half to Maria and one-half to Catherine. The Court of Appeal modified the judgment holding that Catherine was entitled to one-half, being her share as a good-faith putative spouse, and the other half belonged to the legal community of Manuel and Maria. Manuel had a right to dispose of one-half of that half by his will, but the other half, one-fourth of the gross estate, belonged to Maria. As

authority, the Court of Appeal cited *Estate of Ricci* and quoted from Professor Burby's comments as set forth in *Ricci*, above.

*Estate of Atherley* (1975) 44 Cal.App.3d 758 [119 Cal.Rptr. 41, 81 A.L.R.3d 97], was a contest between Ruth, the legal wife of Harold, and his putative wife, Annette, for determination of heirship to Harold's intestate estate. Ruth and Harold were married in 1933 and had two children. Harold left Ruth in 1947 and joined Annette. Harold and Annette lived together from 1947 until Harold's death in 1969; they had no children. In 1961 Harold obtained an invalid divorce from Ruth in Mexico, and in 1962 Harold married Annette in Nevada. Ruth, Harold, and Annette were in touch with each other from time to time; they shared in common the knowledge of Harold's marriage with Ruth, his cohabitation with Annette, his invalid divorce from Ruth and his void marriage with Annette. Most of Harold's estate had been accumulated during the period of his cohabitation with Annette, both before and after the void Mexican divorce and Nevada marriage. The trial court held that Ruth was the surviving spouse and implicitly held that Annette was Harold's putative spouse. The estate was comprised of a mixture of real and personal property, including separate property and joint tenancy property. The Court of Appeal, applying the rule of *Sousa* v. *Freitas, supra,* 10 Cal.App.3d 660, held that Annette, the putative spouse, was entitled to one half of the total estate as well as those assets which were hers by separate ownership or joint tenancy survivorship, and that the rest of the estate was property of the legal marriage and passed by intestate succession; that Ruth had an interest in that property as the surviving spouse but, since Ruth and Harold had two children, the extent of her interest depended on whether it was community or separate property. The judgment was reversed in part with directions.

*Estate of Vargas* (1974) 36 Cal.App.3d 714 [111 Cal.Rptr. 779, 81 A.L.R.3d 1], was a contest between Mildred, the first and legal wife of Juan, and Josephine, Juan's putative wife, competing for Juan's intestate estate. Mildred and Juan were married in 1929, raised three children, and lived together continuously for 40 years until Juan's death in 1969. Juan and Josephine were married in 1945, raised four children, and lived together for 24 years until Juan's death in 1969. Neither Mildred nor Josephine knew of the existence of the other, though both "families" lived in the Los Angeles area. The trial court ruled that Josephine was Juan's putative spouse. Most of the assets were acquired after 1945, during the period of the dual-familial relationship. The Court of Appeal affirmed the trial court's division of the estate equally between the legal wife and the putative spouse on equitable principles, stating: "Since statutes and judicial decisions provide no sure guidance for the resolution of the controversy, the probate court cut the Gordian knot of competing claims and divided

the estate equally between the two wives, presumably on the theory that innocent wives of practicing bigamists are entitled to equal shares of property accumulated during the active phase of the bigamy. No injury has been visited upon third parties, and the wisdom of Solomon is not required to perceive the justice of the result." (*Id.*, at p. 719.)

In the light of the foregoing it is clear that every court which has considered the issue of succession to a decedent's intestate estate, as between a surviving legal spouse and a surviving putative spouse, has awarded one-half of the quasi-marital property to the putative spouse and the other half to the legal spouse, or spouse and children, under the provisions of section 221.

It appears that Civil Code section 4452 was designed to provide for the division of quasi-marital property in accordance with section 4800, in the event of an annulment by the parties of their void or voidable marriage or their voluntary separation.

■ However, the enactment of section 4452 did not repeal or supersede former section 221 of the Probate Code nor sections 5126 and 5118 of the Civil Code.

■ There are no provisions in the Probate Code governing the distribution of quasi-marital property on the death of a party to a void or voidable marriage. However, Civil Code section 4452 officially recognizes the status of "putative spouse," creates the classification of "quasi-marital property," and provides for the division of that property, if necessary, pursuant to Civil Code section 4800, i.e., equal division. By analogy, recognition of the right of a putative spouse to an equal division of the quasi-marital property should be followed and applied in distributing that property on the death of a party to a void or voidable marriage.

If we were to apply the provisions of Civil Code sections 5126 and 5118 strictly, literally, and mechanically, Charles' entire intestate estate would be his separate property and, pursuant to former section 221 of the Probate Code, would be distributed to Joan and the four children, and Helen would receive nothing.

On the other hand, if we were to look only to Civil Code section 4452, and to give it the broadest possible construction, Charles' entire intestate estate would be treated as though it were the community property of Charles and Helen and, pursuant to former section 201 of the Probate Code, the entire estate would go to Helen, and Joan and the four children would receive nothing.

If the entire estate were distributed to Joan and the four children we would be ignoring and denying the purpose of Civil Code section 4452; and if the entire estate were distributed to Helen we would be ignoring and denying the purpose of Civil Code sections 5126 and 5118 and former section 221 of the Probate Code, as well as the strong public policy which favors and protects marriage and the family. The result in either such case would be grossly unfair and unconscionable.

It is clear that our statutes are not designed to provide for the unique circumstances present in this case. ■■■ When statutes are in conflict, the requirements of some being in irreconcilable opposition to others, only the chancellor can protect the innocent and render justice.

■■■ Since a just distribution of the estate among the parties is not provided by any statute, this case cries out for the firm but fair hand of equity for its resolution.

"'Equity or chancery law has its origin in the necessity for exceptions to the application of rules of law in those cases where the law, by reason of its universality, would create injustice in the affairs of men.' [Citations.]" (*Estate of Vargas, supra,* 36 Cal.App.3d 714, 718.)

The first duty of equity is to be equitable. In this case equity demands, and we hold, that one-half of the estate should be distributed to Helen, the putative spouse, and the other half to Joan, the legal spouse, and the four children of Charles, as provided by former section 221 of the Probate Code. This result is inherently fair.

With this result we will have done equity to all of the parties and will have honored the spirit of all of the statutory provisions which apply.

*The Trial Court's Finding as to Estoppel Is Not Relevant to the Issues of This Case*

■■■ In its Statement of Decision, the trial court found that, on the single issue of the validity of Charles' marriage to Helen, Joan was not estopped by any act or omission on her part to assert the invalidity of that marriage.

The court then found that Charles would have been estopped to challenge his marriage to Helen and, therefore, Joan and their three children, by privity, would also be so estopped. The court stated that it did not consider the latter finding to be necessary to its decision but would make the finding nevertheless. Inasmuch as the trial court apparently felt some

compulsion to make that finding, and that compulsion may have had some effect on the court's ultimate decision, we will discuss it briefly.

First, we remember that the central issue presented by this appeal is: As between the surviving wife and children of a bigamous husband, and his putative spouse, who is entitled to succeed to his intestate estate?

We are not concerned here with whether Charles, or Joan, or their children are estopped from challenging the validity of Charles' marriage to Helen. Established precedent indicates that Charles would be so estopped. (*In re Marriage of Recknor* (1982) 138 Cal.App.3d 539 [187 Cal.Rptr. 887, 34 A.L.R.4th 805].) But that was not the issue before the trial court. And we need not, and do not, reach the question, "Does privity extend the estoppel of the actor to his innocent wife and children under the facts of this case?" i.e., whether such estoppel as to Charles would extend to and bar Joan and their children.

■ The foundation of estoppel is justice and good conscience. Estoppel applies to prevent a person from asserting a right where his conduct makes it unconscionable for him to assert it; it is a bar to stating the truth when it would be unfair to state it. Estoppel is an equitable doctrine. It acts defensively only. It operates to prevent one from taking an unfair advantage of another, but not to give an unfair advantage to one seeking to invoke the doctrine. (*Peskin* v. *Phinney* (1960) 182 Cal.App.2d 632, 636 [6 Cal.Rptr. 389]; *Franklin* v. *Merida* (1868) 35 Cal. 558, 575.) Estoppel should be employed to prevent or mitigate injustice, not to create or aggravate it.

■ If, by privity with Charles, Joan were estopped to deny the validity of Charles' marriage to Helen then, by the same reasoning, Helen, by privity with Charles, would be estopped to deny Charles' marriage to Joan. Insofar as estoppel is concerned, Joan and Helen would find themselves in a deadlock.

It appears that the trial court's finding that Joan and the children, by privity with Charles, would be estopped to deny the validity of his marriage to Helen was gratuitous. There is nothing in the record which would justify the application of the doctrine of estoppel in this case.

*Joan and the Children Are Entitled to Assert Their Rights to Succeed to Charles' Intestate Estate*

■ The competing tensions in this case are the claims by Joan and the children to succeed to the separate property of Charles' intestate estate, as opposed to Helen's claim to the entire estate as quasi-marital property.

Those were the issues raised by the pleadings and to be adjudicated in the trial court. In the litigation of those tensions, Joan was not estopped to assert the validity of her own marriage to Charles; the children were not estopped to assert their status as the children of Charles; and Joan and the children were not estopped to assert their rights to succeed to the separate property in Charles' intestate estate as provided in former section 221 of the Probate Code.

As we have seen, our California courts have decided such issues by awarding one-half of the quasi-marital property to the putative spouse and the other half to the legal spouse, or legal spouse and children, or in accordance with the decedent's will.

The case at bench is similar in some respects to *Estate of Vargas, supra,* 36 Cal.App.2d 714, in which Justice Fleming stated, at page 718: "The present case is complicated by the fact that the laws regulating succession . . . and the disposition of marital property are not designed to cope with the extraordinary circumstance of purposeful bigamy at the expense of two innocent parties. The laws of marital succession assume compliance with basic law . . . and do not provide for contingencies arising during the course of felonious activity. For this reason resort to equitable principles becomes particularly appropriate here." (Fn. omitted.)

As was the case in *Vargas,* a resort to equitable principles would be particularly appropriate in the case at bench.

*The Granting of a Family Allowance to the Putative Spouse Was Contrary to Law*

■■■ Appellants contend that the trial court's award of a family allowance to Helen, a putative spouse, was error and contrary to law in that the authorizing statute provides for a family allowance to the "surviving spouse" of a decedent but does not so provide to a surviving putative spouse.

In 1984, former section 680 of the Probate Code provided, in pertinent part: "(a) The surviving spouse, minor children, and . . . are entitled to such reasonable allowance out of the estate as shall be necessary for their maintenance according to their circumstances, during the progress of the settlement of the estate."

The 1983 amendment to the Probate Code, effective January 1, 1985, rewrote those provisions in section 6540 of the Probate Code but made no substantial changes in the pertinent portion.

The word "spouse" means "One's wife or husband." (*Black's Law Dictionary* (5th ed.) p. 1258; and see *Menchaca* v. *Farmers Insurance Exchange* (1976) 59 Cal.App.3d 117, 128 [130 Cal.Rptr. 607].) The statutes do not contemplate that a person have more than one spouse at one time. (Civ. Code, § 4401, subd. (1); Pen. Code, § 281.)

As we have noted, the trial court found that Joan and Charles were married in 1954 and that neither had taken any steps to dissolve that marriage.[13]

Therefore, Joan was Charles' spouse at the time of his death.

The court also found that the marriage of Helen and Charles was invalid [void] in that Charles had never obtained a divorce from Joan. Helen was never Charles' spouse. Helen did qualify as a "putative spouse" under the "good faith" provisions of Civil Code section 4452.

The right to a family allowance is entirely statutory and is given by section 680 of the Probate Code. That section does not authorize the probate court to make an allowance for the benefit of persons other than the persons specified therein. (*Estate of Blair* (1954) 42 Cal.2d 728, 730 [269 P.2d 612].)

"It follows from the express provisions of section 680 that a prerequisite for family allowance is that the claimant be the decedent's widow." (*Estate of Casimir* (1971) 19 Cal.App.3d 773, 778 [97 Cal.Rptr. 623]; *Estate of Brooks* (1946) 28 Cal.2d 748, 750 [171 P.2d 724].)

Appellants stated in their opening brief that they know of no reported decisions in California holding that a putative spouse is entitled to a family allowance. Respondent discusses the subject in her brief but cites no such case to us, and we have found none.

It is not the role of the courts to legislate. In a situation such as that before us, courts should exercise restraint and leave the power to legislate where our Constitution has placed it, in the Legislature. (Cal. Const., art. IV, § 1.) The Legislature enacted the Family Law Act, including Civil Code section 4452, which recognized and gave certain rights to putative spouses. It also rewrote substantial portions of the Probate Code in 1983, effective 1985, including the repeal of former section 680 and its re-enactment with amendments as section 6540 of the present Probate Code. In so amending those statutes the Legislature did not provide for a family

---

[13]See Civil Code section 4350, footnote 9, *ante*.

allowance for a putative spouse though it easily could have done so if that had been its intent. We cannot attribute these facts to oversight.

The language of section 680 is not ambiguous; it clearly provides that a surviving spouse is entitled to a reasonable family allowance. The judicial decisions interpreting and applying section 680 declare that it does not authorize the probate court to make a family allowance for the benefit of persons other than those specified therein. A putative spouse is not one of the persons specified in section 680 and the court's award of a family allowance to a putative spouse is contrary to law.

*The Trial Court Erred in Denying a Family Allowance to the Surviving Spouse on the Basis of Its Ruling That She Was Not an Heir*

 Appellants also contend that the court erred in denying a family allowance to Joan, the surviving spouse and widow of the decedent, and in terminating her previous stipulated allowance of $400 per month on entry of the judgment below.

The trial court found and ordered that Joan was not entitled to a family allowance by reason of its ruling that "Helen has a legal right to succeed to the entire estate under Probate Code section 201 as a surviving spouse."

The effect of that ruling was to declare that since the court had held that Joan would not inherit, and thus was not an heir, she was not entitled to a family allowance. The court erred. The right to a family allowance does not depend upon heirship, it depends upon the claimant's right to support at the time of decedent's death and the existence of a statutorily specified relationship between the claimant and the decedent, in this case that of "surviving spouse."

In their brief appellants demonstrate that reported decisions of our courts hold that "the right to the family allowance does not rest upon, or equate with, the right of inheritance. . . ." and that a family allowance may be awarded to a wife living apart from decedent. (*Estate of Woodward* (1964) 230 Cal.App.2d 113, 116 [40 Cal.Rptr. 781, 12 A.L.R.3d 1134]; to the same effect see *Estate of Foreman* (1936) 16 Cal.App.2d 96, 99 [60 P.2d 310]; *Estate of Coons* (1951) 107 Cal.App.2d 531, 535-536 [237 P.2d 291].) A surviving spouse is entitled to a family allowance if entitled to support at decedent's death, and it is not required that the spouse was actually receiving such support at decedent's death. (*Estate of Brooks* (1946) 28 Cal.2d 748, 755 [171 P.2d 724]; *Estate of Fallon* (1957) 49 Cal.2d 402, 404-405 [317 P.2d 963]; *Estate of Foreman, supra; Estate of Coons, supra.*)

Respondent has cited no authority to the contrary of the above.

 When the right of a wife to receive support from her husband exists at the time of his death, the granting or withholding of support from his estate is not a matter within the discretion of the probate court, though the court has a broad discretion in determining the reasonableness and necessity for a family allowance. (*Estate of Secord* (1948) 84 Cal.App.2d 783, 785-786 [192 P.2d 81], and see discussion and authorities cited at 7 Witkin, Summary of Cal. Law (8th ed. 1974) Wills and Probate, §§ 517-518, 521, pp. 5935-5941.) Joan, as Charles' spouse, had a right to receive support from Charles at the time of his death, and it matters not that she was not actually receiving such support.

"Every individual shall support his or her spouse. . . ." (Civ. Code, § 242), but "[a] spouse is not liable for the support of the other spouse when the other spouse is living separate from the spouse by agreement. . . ." (Civ. Code, § 5131.)

There is no evidence in the record of this case that Joan was living separate from her husband, Charles, by agreement. Indeed the evidence is overwhelming that Charles deserted and abandoned Joan and their children in 1958 and thereafter contributed only a gross of $80 to their support.

Respondent attempted to counter appellants' argument by asserting that this was a case of "multiple claimants" for family allowance and that it must, somehow, be treated differently under former section 682; that argument is not valid. First, this is not a multiple claimant case. Section 680 provides that those individuals having a right to an allowance are the "surviving spouse, minor children" and certain others. There can be only one surviving spouse; in this case, Joan. There were no minor children or members of the other listed categories of eligibles. Multiple claimant cases find one or more persons from each of two or more of the listed categories, all seeking an allowance. Second, section 682 does not apply to this case; it reads, in part: "If any person or persons *otherwise eligible* for family allowance under Section 680. . . ." (Italics added.) Helen is not a person "otherwise eligible" under section 680. Therefore, section 682 does not apply at all.

Respondent also states in her brief that the opinion of our Supreme Court in *Estate of Leslie, supra,* 37 Cal.3d 186, 203, accords ". . . a surviving putative spouse the same rights as a surviving spouse." That is a gross over-statement and a misleading truncation of the original. The statement in *Leslie* referred to is, precisely, "Virtually every court which has considered the issue has accorded a surviving putative spouse the same rights as

a surviving legal spouse." (*Id.,* at p. 203.) The "issue" decided in *Leslie,* and the object of the above quotation, was: "this court holds that a surviving putative spouse is entitled to succeed to a share of the decedent's separate property." (*Id.,* at p. 204.)

Even so, our Supreme Court expressly disclaimed resolution of such a controversy if two or more surviving spouses should claim an intestate share. (*Id.,* at p. 197, fn. 11.)

### CONCLUSION

On the basis of legal precedents, as set forth above, and equitable principles, we must reverse the judgment and remand the cause with instructions.

We find that the property of the estate of decedent Charles Hafner should be awarded one-half to his putative spouse, Helen Hafner, and the other half to be awarded to and divided among his legal and surviving spouse, Joan, and his four children, Catherine, Lillian, Dorothy and Kimberly, in accordance with former section 221 of the Probate Code.

The court shall also reconsider its previous decision as to a family allowance for Joan, Charles' legal wife, as well as for Helen, and shall order that any allowances paid to Joan or to Helen during the administration of this estate shall be charged against the amount of the distributive share of this estate to which Joan or Helen shall be entitled, as was agreed in the stipulation filed November 1, 1983.

### DECISION

The judgment is reversed. The cause is remanded with instructions that the court make and enter a new and different judgment consistent with this opinion. Costs are awarded to appellants.

Arabian, J., concurred.

**LUI, Acting P. J.,** Dissenting.—The majority's decision fails to grant the surviving putative spouse, Helen Hafner, any share of the deceased's separate property. The majority thereby ignores our Supreme Court's decision in *Estate of Leslie* (1984) 37 Cal.3d 186 [207 Cal.Rptr. 561, 689 P.2d 133], and the statutory scheme set forth in former Probate Code section 221[1] governing intestate succession to separate property.

---

[1]Former Probate Code section 221 provided that: "If the decedent leaves a surviving spouse, and only one child or the lawful issue of a deceased child, the estate goes one-half to the surviving spouse and one-half to the child or issue. If the decedent leaves a surviving spouse, and more than one child living or one child living and the lawful issue of one or more deceased children, the estate goes one-third to the surviving spouse and the remainder in equal shares to his children . . . ."

Intestate succession in California is governed exclusively by statute. The basic flaw in the majority's analysis is that it attempts to apply equitable principles in distributing the decedent's estate instead of following the statutory scheme.

The majority relies on decisions which predate the enactment of Civil Code section 4452 (section 4452). These appellate decisions applied equitable principles to establish the right of a surviving putative spouse to succeed to a distributive share of property accumulated during a putative union under former Probate Code sections 201 and 201.5 (dealing with community and quasi-community property respectively) as a "surviving spouse."[2] The equitable doctrines developed in the pre-section 4452 line of cases did not alter the formula for intestate succession as set forth in the Probate Code. The majority's resolution of this case, however, does alter the statutory formula for intestate succession.

In enacting section 4452, the Legislature established the legal right of a surviving putative spouse to property acquired during the putative union which would have been community property or quasi-community property if the union had not been void or voidable, and termed this property "quasi-marital property."

Under section 4452, the putative spouse has a vested share of one-half of the quasi-marital property accumulated during the putative union. If the union is dissolved prior to the death of one spouse, each spouse is entitled to one-half of the quasi-marital property. Death of either spouse to a pu-

---

[2]The majority opinion at page 1393 states: "[I]t is clear that every court which has considered the issue of succession to a decedent's intestate estate, as between a surviving legal spouse and a surviving putative spouse, has awarded one-half of the quasi-marital property to the putative spouse and the other half to the legal spouse, or spouse and children, under the provisions of [former Probate Code] section 221." The majority cites *Estate of Ricci* (1962) 201 Cal.App.2d 146 [19 Cal.Rptr. 739]; *Sousa* v. *Freitas* (1970) 10 Cal.App.3d 660 [89 Cal.Rptr. 485]; *Estate of Atherley* (1975) 44 Cal.App.3d 758 [119 Cal.Rptr. 41, 81 A.L.R.3d 97]; and *Estate of Vargas* (1974) 36 Cal.App.3d 714 [111 Cal.Rptr. 779, 81 A.L.R.3d 1].

The decisions in *Estate of Ricci, supra,* 201 Cal.App.2d 146, and *Sousa* v. *Freitas, supra,* 10 Cal.App.3d 660, are distinguishable from the present appeal because these decisions predate the enactment of Civil Code section 5118. The decision in the *Estate of Atherley, supra,* 44 Cal.App.3d 758 did not consider the applicability of section 5118 since that statute, as originally enacted, was not effective until after the decedent Harold Atherley's death in 1969. The decision in *Vargas, supra,* 36 Cal.App.3d 714 is distinguishable under a unique factual situation not present in this appeal. In *Vargas,* two innocent women were victims of a man who had contemporaneously lived a double life. In this appeal, appellant had long been deserted by the decedent and had learned to live her life separate and apart from the decedent physically, emotionally, and financially.

Thus, none of the decisions from which the majority rests its conclusion considers the fact situation presented in this appeal and the impact of the enactment of Civil Code sections 4452 and 5118.

tative union does not terminate the surviving spouse's interest in quasi-marital property.

A surviving putative spouse's one-half interest in quasi-marital property is vested and not subject to intestate succession by any other person. Thus, the proper legal distribution of the decedent's estate gives the putative spouse one-half of the decedent's entire estate pursuant to section 4452.[3]

Purporting to apply general and equitable principles which are inapplicable, the majority then concludes that only the surviving legal spouse and the deceased's four children are entitled to share in the other half of the decedent's entire estate. The majority thus holds that the surviving putative spouse has no interest whatsoever in the decedent's separate property. The majority's holding violates former Probate Code section 221 and the *Estate of Leslie* and errs in attempting a resolution of this thorny problem by distributing decedent's separate property on an "all or nothing" basis.

In *Leslie,* the Supreme Court was confronted with the conflicting claims to a deceased wife's separate property asserted by her putative husband and a son by a prior marriage. The question presented in *Leslie* was whether the putative husband was entitled to succeed to a share of the *deceased wife's separate property* under the Probate Code rather than under equitable principles. The court in *Leslie* concluded that the trial court had *incorrectly* determined that the husband was *not* the decedent's "surviving spouse" under former Probate Code section 221.

*Leslie* cited the decision in *Estate of Krone* (1948) 83 Cal.App.2d 766 [189 P.2d 741], and stated that "*Krone* has been read 'to recognize a putative [spouse] as a legal spouse for the purpose of succession,'" under Probate Code section 201, citing *Kunakoff* v. *Woods* (1958) 166 Cal.App.2d 59, 65-66 [332 P.2d 773], and "[t]hat reading is clearly applicable to the determination of the separate property rights of a putative spouse." (*Estate of Leslie, supra,* 37 Cal.3d at p. 194.)

"To accord a surviving putative spouse rights to the decedent's separate property honors rather than disregards the statutory scheme governing intestate succession. (Laughran & Laughran [*Property and Inheritance Rights of Putative Spouses in California: Selected Problems and Suggested*

---

[3]The majority concludes that the putative spouse is entitled to one-half of the decedent's estate but under a different analysis.

The trial court concluded that section 4452 allows the putative spouse to succeed to the decedent's entire estate. While the trial court's conclusion has arguable merit, I would interpret section 4452 as applying only to the surviving putative spouse's one-half interest in the quasi-marital property if the deceased spouse also left a legal spouse and/or children.

*Solutions* (1977)] 11 Loyola L.A. L.Rev. [45] at p. 67 . . . .) *Since the right to succession is not an inherent or natural right, but purely a creature of statute* [citation], *a surviving legal spouse inherits a decedent's separate property 'only because the statutes provide that a person having the status of "surviving spouse" takes a certain share.'* (Laughran & Laughran, *op. cit. supra,* 11 Loyola L.A. L.Rev. at p. 67.) *To accord a surviving putative spouse the status of 'surviving spouse' simply recognizes that a good faith belief in the marriage should put the putative spouse in the same position as a survivor of a legal marriage. (Id.,* at p. 68.)" *(Estate of Leslie, supra,* 37 Cal.3d at p. 199, italics added.)

Under the above-quoted reasoning of *Leslie,* a surviving putative spouse is entitled to a legal share of a deceased spouse's separate property. While the court in *Leslie* was not faced with the conflicting claims of two spouses, its reasoning that the rights of surviving putative and legal spouses should be given parity under the law is instructive to a resolution of this appeal. Putting their respective rights to the deceased spouse's separate property on par requires that the surviving putative and legal spouses share that portion of the deceased's separate property to which each is entitled to under former Probate Code section 221.

The proper legal distribution of the decedent's estate in this case should result in the surviving putative spouse taking one-half of the decedent's entire estate pursuant to section 4452 as her quasi-marital property. As to the remainder of the decedent's estate, following the mandate in *Leslie,* the putative and legal spouses should be treated equally. Therefore, under former Probate Code section 221, the proper legal distribution of the remainder of the decedent's estate should be as follows: one-third of that portion of the estate should be divided equally between the surviving putative and legal spouses; the remaining two-thirds should be distributed in equal shares to the decedent's four children by both relationships.[4]

The majority concludes that the surviving putative spouse is not entitled to a family allowance because she is not a "surviving spouse" within the meaning of Probate Code section 6540 (section 6540). Section 6540 provides that the surviving spouse, minor children, and dependent adult handicapped children are entitled to an allowance necessary for their maintenance during the administration of the estate.

The majority's conclusion is unreasonable in view of the *Leslie* mandate which accords a putative spouse equal status with the legal spouse *for*

---

[4]It should be noted that the only difference between the distribution suggested here and that formulated by the majority is that the surviving spouse's share of the decedent's separate property would be divided by the surviving legal and putative spouses and not given entirely to the surviving legal spouse.

*essentially all purposes.* (See *Estate of Leslie, supra,* 37 Cal.3d at pp. 195-196.) The better resolution is to give both the surviving putative and legal spouses consideration for a family allowance should their circumstances warrant it. Following the majority's reasoning, if the decedent left only a putative spouse and no legal spouse, the putative spouse would *not* be entitled to a family allowance. It is unlikely that the Legislature intended such a narrow reading of section 6540.

I would remand the matter to the superior court for a modification of the judgment consistent with the distribution scheme set forth above. I would also require the trial court to consider the necessity of a family allowance to both spouses under section 6540.

Respondent's petition for review by the Supreme Court was denied November 20, 1986. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.